(Slip Opinion) OCTOBER TERM, 2012 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## METRISH, WARDEN *v.* LANCASTER

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 12–547. Argued April 24, 2013—Decided May 20, 2013

On April 23, 1993, respondent Burt Lancaster, a former police officer with a long history of severe mental-health problems, shot and killed his girlfriend. At his 1994 jury trial in Michigan state court, Lancaster asserted a defense of diminished capacity. Under then-prevailing Michigan Court of Appeals precedent, the diminished-capacity defense permitted a legally sane defendant to present evidence of mental illness to negate the specific intent required to commit a particular crime. Apparently unpersuaded by Lancaster's defense, the jury convicted him of first-degree murder and a related firearm offense. Lancaster, however, later obtained federal habeas relief from these convictions.

By the time of Lancaster's retrial, the Michigan Supreme Court had rejected the diminished-capacity defense in its 2001 decision in *Carpenter*. Although the murder with which Lancaster was charged occurred several years before *Carpenter* was decided, the judge at his second trial applied *Carpenter* and therefore disallowed renewal of his diminished-capacity defense. Lancaster was again convicted. Affirming, the Michigan Court of Appeals rejected Lancaster's argument that the trial court's retroactive application of *Carpenter* violated due process.

Lancaster reasserted his due process claim in a federal habeas petition. The District Court denied the petition, but the Sixth Circuit reversed. Concluding that the Michigan Supreme Court's 2001 rejection of the diminished-capacity defense was unforeseeable in April 1993, when Lancaster killed his girlfriend, the Sixth Circuit held that, by rejecting Lancaster's due process claim, the Michigan Court of Appeals had unreasonably applied clearly established federal law.

*Held*: Lancaster is not entitled to federal habeas relief. Pp. 4–15.

Syllabus

(a) Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Lancaster may obtain federal habeas relief only if the Michigan Court of Appeals, in rejecting his due process claim, unreasonably applied "clearly established Federal law, as determined by [this] Court." 28 U. S. C. §2254(d)(1). This standard is "difficult to meet": Lancaster must show that the Michigan Court of Appeals' decision rested on "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington* v. *Richter*, 562 U. S. ___, ___. To determine whether Lancaster has satisfied that demanding standard, the Court first considers two key decisions: *Bouie* v. *City of Columbia*, 378 U. S. 347, and *Rogers* v. *Tennessee*, 532 U. S. 451. It then considers whether the Michigan Court of Appeals' decision qualifies as an unreasonable application of those decisions to Lancaster's case. Pp. 4–5.

(b) *Bouie* concerned African-American petitioners who had refused to leave a South Carolina drug store's whites-only restaurant area after entering without notice that the store's policy barred their entry. They were convicted under a South Carolina trespass statute prohibiting "'entry upon the lands of another . . . after notice from the owner or tenant prohibiting such entry.'" 378 U. S., at 349–350. The South Carolina Supreme Court based its affirmance of the petitioners' convictions on its prior decision in *Mitchell,* where the court held that the trespass statute reached both unauthorized entries and "the act of remaining on the premises of another after receiving notice to leave." 378 U. S., at 350. *Mitchell*, however, was rendered 21 months after the petitioners' arrest. This Court held that the Due Process Clause prohibited *Mitchell*'s retroactive application to the *Bouie* petitioners, stressing that *Mitchell*'s interpretation of the state trespass statute was "clearly at variance with the statutory language" and "ha[d] not the slightest support in prior South Carolina decisions." 378 U. S., at 356.

In *Rogers*, the petitioner contested the Tennessee Supreme Court's retroactive abolition of the common-law "year and a day rule," which barred a murder conviction "unless [the] victim had died by the defendant's act within a year and a day of the act." 532 U. S., at 453. This Court found no due process violation. "[J]udicial alteration of a common law doctrine of criminal law," the Court held, "violates the principle of fair warning, and hence must not be given retroactive effect, only where [the alteration] is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue.'" *Id.*, at 462. Judged by this standard, the retroactive abolition of the year and a day rule encountered no constitutional impediment. The rule was "widely viewed as an outdated relic of the common law," had been routinely rejected by modern courts and

legislators, and had been mentioned in reported Tennessee decisions "only three times, and each time in dicta." *Id.*, at 462–464.  Pp. 6–8.

(c) The Michigan Court of Appeals' rejection of Lancaster's due process claim does not represent an unreasonable application of the law this Court declared in *Bouie* and *Rogers.*  Pp. 8–15.

(1) The Michigan Court of Appeals first recognized the diminished-capacity defense in 1973.  Two years later, the Michigan Legislature prescribed comprehensive requirements for defenses based on mental illness or retardation.  In 1978, the Michigan Court of Appeals ruled that the diminished-capacity defense fit within the codified definition of insanity.  The Michigan Supreme Court's 2001 decision in *Carpenter*, however, rejected that position, holding that the diminished-capacity defense was not encompassed within the Michigan Legislature's comprehensive scheme for mental-illness defenses and thus could not be invoked by criminal defendants.  Pp. 8–12.

(2) In light of this Court's precedent and the history of Michigan's diminished-capacity defense, the Michigan Court of Appeals' decision applying *Carpenter* retroactively is not "an unreasonable application of . . . clearly established [f]ederal law."  28 U. S. C. §2254(d)(1).  This case is a far cry from *Bouie*, where the South Carolina Supreme Court unexpectedly expanded "narrow and precise statutory language" that, as written, did not reach the petitioners' conduct.  378 U. S., at 352.  In *Carpenter*, by contrast, the Michigan Supreme Court rejected a diminished-capacity defense that the court reasonably found to have no home in a comprehensive, on-point statute enacted by the Michigan Legislature.  Although Lancaster's due process claim is arguably less weak than the due process claim rejected in *Rogers*, the Court did not hold in *Rogers* that a newly announced judicial rule may be applied retroactively only if the rule it replaces was an "outdated relic" rarely appearing in a jurisdiction's case law.  532 U. S., at 462–467.  Distinguishing *Rogers* thus does little to bolster Lancaster's argument that the Michigan Court of Appeals' decision unreasonably applied clearly established federal law.  This Court has never found a due process violation in circumstances remotely resembling Lancaster's case—*i.e.*, where a state supreme court, squarely addressing a particular issue for the first time, rejected a consistent line of lower court decisions based on the supreme court's reasonable interpretation of the language of a controlling statute.  Fairminded jurists could conclude that a state supreme court decision of that order is not "'unexpected and indefensible by reference to [existing] law.'"  *Id.*, at 462.  Pp. 12–15.

683 F. 3d 740, reversed.

GINSBURG, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 12–547

LINDA METRISH, WARDEN, PETITIONER *v.*
BURT LANCASTER

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[May 20, 2013]

JUSTICE GINSBURG delivered the opinion of the Court.

Burt Lancaster was convicted in Michigan state court of first-degree murder and a related firearm offense. At the time the crime was committed, Michigan's intermediate appellate court had repeatedly recognized "diminished capacity" as a defense negating the *mens rea* element of first-degree murder. By the time of Lancaster's trial and conviction, however, the Michigan Supreme Court in *People* v. *Carpenter*, 464 Mich. 223, 627 N. W. 2d 276 (2001), had rejected the defense. Lancaster asserts that retroactive application of the Michigan Supreme Court's decision in *Carpenter* denied him due process of law. On habeas review, a federal court must assess a claim for relief under the demanding standard set by the Antiter-rorism and Effective Death Penalty Act of 1996 (AEDPA). Under that standard, Lancaster may gain relief only if the state-court decision he assails "was contrary to, or in-volved an unreasonable application of, clearly established Federal law, as determined by [this] Court." 28 U. S. C. §2254(d)(1). We hold that Lancaster's petition does not meet AEDPA's requirement and that the United States

Court of Appeals for the Sixth Circuit erred in granting him federal habeas relief.

I

On April 23, 1993, Lancaster, a former police officer with a long history of severe mental-health problems, shot and killed his girlfriend in a shopping-plaza parking lot. At his 1994 jury trial in Michigan state court, Lancaster admitted that he had killed his girlfriend but asserted insanity and diminished-capacity defenses. Under then-prevailing Michigan Court of Appeals precedent, a defendant who pleaded diminished capacity, although he was legally sane, could "offer evidence of some mental abnormality to negate the specific intent required to commit a particular crime." *Carpenter*, 464 Mich., at 232, 627 N. W. 2d, at 280. If a defendant succeeded in showing that mental illness prevented him from "form[ing] the specific state of mind required as an essential element of a crime," he could "be convicted only of a lower grade of the offense not requiring that particular mental element." *Ibid.* (internal quotation marks omitted).

Apparently unpersuaded by Lancaster's defenses, the jury convicted him of first-degree murder, in violation of Mich. Comp. Laws Ann. §750.316 (West 1991),[1] and possessing a firearm in the commission of a felony, in violation of §750.227b (West Cum. Supp. 2004). Lancaster later obtained federal habeas relief from these convictions, however, because, in conflict with *Batson* v. *Kentucky*, 476 U. S. 79 (1986), the prosecutor had exercised a race-based peremptory challenge to remove a potential juror. See *Lancaster* v. *Adams*, 324 F. 3d 423 (CA6 2003).

Lancaster was retried in 2005. By that time, the Michigan Supreme Court had disapproved the "series of [Michigan

———————
[1] As relevant here, a homicide constitutes first-degree murder under Mich. Comp. Laws Ann. §750.316 if it is "wil[l]ful, deliberate, and premeditated."

Court of Appeals] decisions" recognizing the diminished-capacity defense. *Carpenter*, 464 Mich., at 235, 627 N. W. 2d, at 282. In rejecting the defense, Michigan's high court observed that, in 1975, the Michigan Legislature had enacted "a comprehensive statutory scheme concerning defenses based on either mental illness or mental retardation." *Id.*, at 236, 627 N. W. 2d, at 282. That scheme, the Michigan Supreme Court concluded, "demonstrate[d] the Legislature's intent to preclude the use of *any* evidence of a defendant's lack of mental capacity short of legal insanity to avoid or reduce criminal responsibility." *Ibid.*

Although the murder with which Lancaster was charged occurred several years before the Michigan Supreme Court's decision in *Carpenter*, the judge presiding at Lancaster's second trial applied *Carpenter*'s holding and therefore disallowed renewal of Lancaster's diminished-capacity defense. Following a bench trial, Lancaster was again convicted. The trial court imposed a sentence of life imprisonment for the first-degree murder conviction and a consecutive two-year sentence for the related firearm offense.

Lancaster appealed, unsuccessfully, to the Michigan Court of Appeals. See App. to Pet. for Cert. 76a–78a. The appeals court rejected Lancaster's argument that retroactive application of *Carpenter* to his case violated his right to due process. "[D]ue process concerns prevent retroactive application [of judicial decisions] in some cases," the court acknowledged, "especially . . . where the decision is unforeseeable and has the effect of changing existing law." App. to Pet. for Cert. 77a. But *Carpenter* "did not involve a change in the law," the Court of Appeals reasoned, "because it concerned an unambiguous statute that was interpreted by the [Michigan] Supreme Court for the first time." App. to Pet. for Cert. 77a.

After the Michigan Supreme Court declined review, Lancaster reasserted his due process claim in a federal

habeas petition filed under 28 U. S. C. §2254. The District Court denied the petition, 735 F. Supp. 2d 750 (ED Mich. 2010), but it granted a certificate of appealability, see 28 U. S. C. §2253(c).

A divided panel of the Sixth Circuit reversed. 683 F. 3d 740 (2012). The Michigan Supreme Court's decision in *Carpenter* was unforeseeable, the Court of Appeals majority concluded, given (1) the Michigan Court of Appeals' consistent recognition of the diminished-capacity defense; (2) the Michigan Supreme Court's repeated references to the defense without casting a shadow of doubt on it; and (3) the inclusion of the diminished-capacity defense in the Michigan State Bar's pattern jury instructions. 683 F. 3d, at 745–749. These considerations persuaded the Sixth Circuit majority that, in rejecting Lancaster's due process claim, the Michigan Court of Appeals had unreasonably applied clearly established federal law. *Id.*, at 752–753. Accordingly, the Sixth Circuit ruled that Lancaster was entitled to a new trial at which he could present his diminished-capacity defense. *Id.*, at 754. Dissenting, Chief Judge Batchelder concluded that the "Michigan Court of Appeals['] denial of Lancaster's due process claim was reasonable . . . because the diminished-capacity defense was not well-established in Michigan and its elimination was, therefore, foreseeable." *Id.*, at 755.

This Court granted certiorari. 568 U. S. ___ (2013).

## II

To obtain federal habeas relief under AEDPA's strictures, Lancaster must establish that, in rejecting his due process claim, the Michigan Court of Appeals unreasonably applied federal law clearly established in our decisions. See 28 U. S. C. §2254(d)(1).[2] This standard, we have

———————

[2] Title 28 U. S. C. §2254(d) provides that where, as here, a state prisoner's habeas claim "was adjudicated on the merits in State court," a federal court may not grant relief with respect to that claim unless the

explained, is "difficult to meet": To obtain habeas corpus
relief from a federal court, a state prisoner must show that
the challenged state-court ruling rested on "an error well
understood and comprehended in existing law beyond any
possibility for fairminded disagreement." *Harrington* v.
*Richter*, 562 U. S. ___, ___ (2011) (slip op., at 12–13).　To
determine whether Lancaster has satisfied that demand-
ing standard, we consider first two of this Court's key
decisions: *Bouie* v. *City of Columbia*, 378 U. S. 347 (1964),
and *Rogers* v. *Tennessee*, 532 U. S. 451 (2001).　We then
consider whether the Michigan Court of Appeals' decision
qualifies as an unreasonable application of those decisions
to the particular circumstances of Lancaster's case.[3]

――――――

state court's adjudication of the claim (1) "resulted in a decision that
was contrary to, or involved an unreasonable application of, clearly
established Federal law, as determined by the Supreme Court of the
United States," or (2) "resulted in a decision that was based on an
unreasonable determination of the facts in light of the evidence pre-
sented in the State court proceeding."　Lancaster does not allege that
the Michigan Court of Appeals' decision "was based on an unreasonable
determination of the facts" in his case, nor does he develop any ar-
gument that the state court's decision was "contrary to" this Court's
precedents.　See *Williams* v. *Taylor*, 529 U. S. 362, 412–413 (2000) (a
state-court decision is "contrary to" clearly established federal law if
"the state court arrives at a conclusion opposite to that reached by this
Court on a question of law or if the state court decides a case differently
than this Court has on a set of materially indistinguishable facts").　The
only question in this case, therefore, is whether the Michigan Court of
Appeals unreasonably applied "clearly established [f]ederal law, as
determined by [this] Court."　28 U. S. C. §2254(d)(1).

　[3] Lancaster does not argue that the Michigan Supreme Court's rejec-
tion of the diminished-capacity defense in *People* v. *Carpenter*, 464
Mich. 223, 627 N. W. 2d 276 (2001), if applied only prospectively to
defendants whose alleged offenses were committed after the decision
was issued, would violate any constitutional provision.　See *Clark* v.
*Arizona*, 548 U. S. 735, 756–779 (2006) (rejecting due process challenge
to Arizona's restrictions on mental-disease and capacity evidence
offered to negate *mens rea*).　We therefore address only whether the
Michigan Court of Appeals unreasonably applied clearly established
federal law in upholding *Carpenter*'s retroactive application to Lancas-

## A

In *Bouie*, the African-American petitioners were convicted of trespass under South Carolina law after they refused to comply with orders to leave a drug store's restaurant department, a facility reserved for white customers. 378 U. S., at 348–349. This Court held that the convictions violated the due process requirement that "a criminal statute give fair warning of the conduct which it prohibits." *Id.*, at 350. The state statute under which the petitioners were convicted, the Court emphasized, prohibited "*entry* upon the lands of another . . . after notice from the owner or tenant prohibiting such entry." *Id.*, at 349–350 (emphasis added and internal quotation marks omitted). It was undisputed that the petitioners were invited to enter the store and had received no notice that they were barred from the restaurant area before they occupied booth seats. *Id.*, at 350. Nevertheless, the South Carolina Supreme Court affirmed the petitioners' convictions based on its prior decision in *Charleston* v. *Mitchell*, 239 S. C. 376, 123 S. E. 2d 512 (1961). *Bouie*, 378 U. S., at 350, n. 2. The *Mitchell* decision, which the South Carolina Supreme Court found dispositive, was rendered 21 months after the petitioners' arrest. 378 U. S., at 348, 350, n. 2. *Mitchell* held that the trespass statute under which the petitioners were convicted reached not only unauthorized entries; it proscribed as well "the act of remaining on the premises of another after receiving notice to leave." 378 U. S., at 350.

We held that the Due Process Clause prohibited *Mitchell*'s retroactive application to the *Bouie* petitioners. In so ruling, we stressed that *Mitchell*'s interpretation of the South Carolina trespass statute was "clearly at variance with the statutory language" and "ha[d] not the slightest support in prior South Carolina decisions." 378 U. S., at 356. Due process, we said, does not countenance an "un-

_____

ter's case.

foreseeable and retroactive judicial expansion of narrow and precise statutory language." *Id.*, at 352.

In *Rogers*, the petitioner contested the Tennessee Supreme Court's retroactive abolition of the common-law "year and a day rule." 532 U. S., at 453. That rule barred a murder conviction "unless [the] victim had died by the defendant's act within a year and a day of the act." *Ibid.* The victim in *Rogers* had died some 15 months after the petitioner stabbed him. *Id.*, at 454. We held that the Tennessee Supreme Court's refusal to adhere to the year and a day rule in the petitioner's case did not violate due process. *Id.*, at 466–467. The "due process limitations on the retroactive application of judicial decisions," we explained, are not coextensive with the limitations placed on legislatures by the Constitution's *Ex Post Facto* Clauses. *Id.*, at 459. See also U. S. Const., Art. I, §9, cl. 3; *id.*, §10, cl. 1; *Calder* v. *Bull*, 3 Dall. 386, 390 (1798) (*seriatim* opinion of Chase, J.) (describing four categories of laws prohibited by the Constitution's *Ex Post Facto* Clauses). Strictly applying *ex post facto* principles to judicial decisionmaking, we recognized, "would place an unworkable and unacceptable restraint on normal judicial processes and would be incompatible with the resolution of uncertainty that marks any evolving legal system." *Rogers*, 532 U. S., at 461. "[J]udicial alteration of a common law doctrine of criminal law," we therefore held, "violates the principle of fair warning, and hence must not be given retroactive effect, only where [the alteration] is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue.'" *Id.*, at 462 (quoting *Bouie*, 378 U. S., at 354).

Judged by this standard, we explained, the retroactive abolition of the year and a day rule encountered no constitutional impediment. First, the rule was "widely viewed as an outdated relic of the common law" and had been "legislatively or judicially abolished in the vast majority of

jurisdictions recently to have addressed the issue." *Rogers*, 532 U. S., at 462–463. Second, the rule "had only the most tenuous foothold" in Tennessee, having been mentioned in reported Tennessee decisions "only three times, and each time in dicta." *Id.*, at 464. Abolishing the obsolete rule in Rogers' case, we were satisfied, was not "the sort of unfair and arbitrary judicial action against which the Due Process Clause aims to protect." *Id.*, at 466–467.

## B

### 1

Does the Michigan Court of Appeals' rejection of Lancaster's due process claim represent an unreasonable application of the law we declared in *Bouie* and *Rogers*? Addressing that question, we first summarize the history of the diminished-capacity defense in Michigan.

The Michigan Court of Appeals first recognized the defense in *People* v. *Lynch*, 47 Mich. App. 8, 208 N. W. 2d 656 (1973). See *Carpenter*, 464 Mich., at 233, 627 N. W. 2d, at 281. The defendant in *Lynch* was convicted of first-degree murder for starving her newborn daughter. 47 Mich. App., at 9, 208 N. W. 2d, at 656. On appeal, the defendant challenged the trial court's exclusion of psychiatric testimony "bearing on [her] state of mind." *Id.*, at 14, 208 N. W. 2d, at 659. She sought to introduce this evidence not to show she was legally insane at the time of her child's death.[4] Instead, her plea was that she lacked the *mens rea* necessary to commit first-degree murder. *Ibid.*

--------

[4] At the time of *Lynch*, Michigan courts used a two-part test for insanity derived from the Michigan Supreme Court's decision in *People* v. *Durfee*, 62 Mich. 487, 494, 29 N. W. 109, 112 (1886). The *Durfee* test asked "1) whether defendant knew what he was doing was right or wrong; and 2) if he did, did he have the power, the will power, to resist doing the wrongful act?" *People* v. *Martin*, 386 Mich. 407, 418, 192 N. W. 2d 215, 220 (1971). See also *Carpenter*, 464 Mich., at 234, n. 7, 627 N. W. 2d, at 281, n. 7.

Reversing the defendant's conviction and remanding for a new trial, the Michigan Court of Appeals rejected the view "that mental capacity is an all or nothing matter and that only insanity . . . negates criminal intent." *Id.*, at 20, 208 N. W. 2d, at 662. Aligning itself with the "majority . . . view," the court permitted defendants to present relevant psychiatric "testimony bearing on intent." *Id.*, at 20–21, 208 N. W. 2d, at 662–663. See also *id.*, at 20, 208 N. W. 2d, at 662 (noting that "such medical proof" is "sometimes called proof of diminished or partial responsibility").

In 1975, two years after the Michigan Court of Appeals' decision in *Lynch*, the Michigan Legislature enacted "a comprehensive statutory scheme setting forth the requirements for and the effects of asserting a defense based on either mental illness or mental retardation." *Carpenter*, 464 Mich., at 226, 627 N. W. 2d, at 277. See also 1975 Mich. Pub. Acts pp. 384–388. That legislation, which remained in effect at the time of the April 1993 shooting at issue here, provided that "[a] person is legally insane if, as a result of mental illness . . . or . . . mental retardation . . . that person lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law." *Id.*, at 386 (codified as amended, Mich. Comp. Laws Ann. §768.21a(1) (West 2000)). The legislature required defendants in felony cases to notify the prosecution and the court at least 30 days before trial of their intent to assert an insanity defense. 1975 Mich. Pub. Acts p. 385 (codified as amended, §768.20a(1)). Defendants raising an insanity defense, the legislature further provided, must submit to a court-ordered psychiatric examination. *Id.*, at 385 (codified as amended, §768.20a(2)).

The 1975 Act also introduced the verdict of "guilty but mentally ill" for defendants who suffer from mental illness but do not satisfy the legal definition of insanity. *Id.*, at 387 (codified as amended, §768.36(1) (West Cum. Supp.

2013)).  The legislature provided for the psychiatric evaluation and treatment of defendants found "guilty but mentally ill" but did not exempt them from the sentencing provisions applicable to defendants without mental illness. *Id.*, at 387–388 (codified as amended, §§768.36(3)–(4)).

Although the 1975 Act did not specifically address the defense of diminished capacity, the Michigan Court of Appeals ruled in 1978 that the defense "comes within th[e] codified definition of legal insanity."  *People* v. *Mangiapane*, 85 Mich. App. 379, 395, 271 N. W. 2d 240, 249. Therefore, the court held, a defendant claiming that he lacked the "mental capacity to entertain the specific intent required as an element of the crime with which he [was] charged" had to comply with the statutory procedural requirements applicable to insanity defenses, including the requirements of pretrial notice and submission to court-ordered examination. *Ibid.*

Because the 1975 Act did not indicate which party bears the burden of proof on the issue of insanity, Michigan courts continued to apply the common-law burden-shifting framework in effect at the time of the insanity defense's codification.  See *People* v. *McRunels*, 237 Mich. App. 168, 172, 603 N. W. 2d 95, 98 (1999).  Under that framework, a criminal defendant bore the initial burden of presenting some evidence of insanity, at which point the burden shifted to the prosecution to prove the defendant's sanity beyond a reasonable doubt.  See *In re Certified Question*, 425 Mich. 457, 465–466, 390 N. W. 2d 620, 623–624 (1986); *People* v. *Savoie*, 419 Mich. 118, 126, 349 N. W. 2d 139, 143 (1984).  The Michigan Court of Appeals applied the same burden-shifting framework to the diminished-capacity defense.  See *People* v. *Denton*, 138 Mich. App. 568, 571–572, 360 N. W. 2d 245, 247–248 (1984).

In 1994, however, the Michigan Legislature amended Mich. Comp. Laws Ann. §768.21a, the statute codifying the insanity defense, to provide that the defendant bears

"the burden of proving the defense of insanity by a pre-
ponderance of the evidence." 1994 Mich. Pub. Acts p. 252
(codified at §768.21a(3)). In *Carpenter*, the defendant
argued that the trial court had erred by applying the 1994
Act to require him to establish his diminished-capacity
defense by a preponderance of the evidence. 464 Mich., at
225–226, 235, 627 N. W. 2d, at 277, 282. Rejecting this
contention, the Michigan Court of Appeals affirmed the
defendant's convictions. See *People* v. *Carpenter*, No.
204051, 1999 WL 33438799 (July 16, 1999) (*per curiam*).
Consistent with its decision in *Mangiapane*, the court held
that the 1994 statutory amendments applied to defend-
ants raising the diminished-capacity defense, and it fur-
ther held that requiring defendants to establish their
diminished capacity by a preponderance of the evidence
did not unconstitutionally relieve the prosecution of its
burden to prove the *mens rea* elements of a crime beyond a
reasonable doubt. *Id.*, at \*1–\*2.

In turn, the Michigan Supreme Court also affirmed, but
it did so on an entirely different ground. As earlier stated,
see *supra*, at 2–3, the court concluded that in no case could
criminal defendants invoke the diminished-capacity de-
fense, for that defense was not encompassed within the
"comprehensive statutory scheme" the Michigan Legisla-
ture had enacted to govern defenses based on mental
illness or retardation. *Carpenter*, 464 Mich., at 236, 627
N. W. 2d, at 282. Noting that previously it had "acknowl-
edged in passing the concept of the diminished capacity
defense,"[5] Michigan's high court emphasized that it had

_____

[5] *Carpenter* cited three decisions in which the Michigan Supreme
Court had previously mentioned the diminished-capacity defense: (1)
*People* v. *Lloyd*, 459 Mich. 433, 450, 590 N. W. 2d 738, 745 (1999) (*per
curiam*), which held that defense counsel was not constitutionally
ineffective in presenting a diminished-capacity defense rather than an
insanity defense; (2) *People* v. *Pickens*, 446 Mich. 298, 329–331, 521
N. W. 2d 797, 811–812 (1994), which rejected a defendant's claim that

"never specifically authorized . . . use [of the defense] in Michigan courts." *Id.*, at 232–233, 627 N. W. 2d, at 281. Squarely addressing the issue for the first time, the court concluded that the diminished-capacity defense was incompatible with the Michigan Legislature's "conclusiv[e] determin[ation]" of the circumstances under which "mental incapacity can serve as a basis for relieving [a defendant] from criminal responsibility." *Id.*, at 237, 627 N. W. 2d, at 283. The statutory scheme enacted by the Michigan Legislature, the court held, "created an all or nothing insanity defense." *Ibid.* But cf. *supra*, at 9. A defendant who is "mentally ill or retarded yet not legally insane," the court explained, "may be found 'guilty but mentally ill,'" but the legislature had foreclosed the use of "evidence of mental incapacity short of insanity . . . to avoid or reduce criminal responsibility by negating specific intent." 464 Mich., at 237, 627 N. W. 2d, at 283.

2

The Michigan Court of Appeals concluded that applying *Carpenter* retroactively to Lancaster's case did not violate due process, for *Carpenter* "concerned an unambiguous statute that was interpreted by the [Michigan] Supreme Court for the first time." App. to Pet. for Cert. 77a. As

_____

his attorney rendered ineffective assistance by failing to pursue a diminished-capacity defense; and (3) *People* v. *Griffin*, 433 Mich. 860, 444 N. W. 2d 139, 140 (1989) (*per curiam*), a summary order remanding a case to the trial court for a hearing on the defendant's claim that the defendant's attorney was ineffective "for failing to explore defenses of diminished capacity and insanity." See *Carpenter*, 464 Mich., at 232–233, 627 N. W. 2d, at 281. See also 683 F. 3d 740, 746–749, 751 (CA6 2012) (describing additional Michigan Supreme Court decisions that mention the diminished-capacity defense, but acknowledging that the Michigan Supreme Court "did not squarely address the validity of the defense until" its 2001 decision in *Carpenter*); App. to Brief for Respondent A–1, A–3 to A–4 (citing eight pre-*Carpenter* Michigan Supreme Court decisions mentioning the diminished-capacity defense).

earlier Michigan Court of Appeals decisions indicate, see *supra,* at 8–10, the bearing of the 1975 legislation on the diminished-capacity defense may not have been apparent pre-*Carpenter*. But in light of our precedent and the history recounted above, see Part II–B–1, *supra*, the Michigan Court of Appeals' decision applying *Carpenter* retroactively does not warrant disapprobation as "an unreasonable application of . . . clearly established [f]ederal law." 28 U. S. C. §2254(d)(1).

This case is a far cry from *Bouie*, where, unlike *Rogers*, the Court held that the retroactive application of a judicial decision violated due process. In *Bouie*, the South Carolina Supreme Court had unexpectedly expanded "narrow and precise statutory language" that, as written, did not reach the petitioners' conduct. 378 U. S., at 352. In *Carpenter*, by contrast, the Michigan Supreme Court rejected a diminished-capacity defense that the court reasonably found to have no home in a comprehensive, on-point statute enacted by the Michigan Legislature. *Carpenter* thus presents the inverse of the situation this Court confronted in *Bouie*. Rather than broadening a statute that was narrow on its face, *Carpenter* disapproved lower court precedent recognizing a defense Michigan's high court found, on close inspection, to lack statutory grounding. The situation we confronted in *Bouie* bears scant resemblance to this case, and our resolution of that controversy hardly makes disallowance of Lancaster's diminished-capacity defense an unreasonable reading of this Court's law.

On the other hand, as the Sixth Circuit recognized, see 683 F. 3d, at 749–751, Lancaster's argument against applying *Carpenter* retroactively is arguably less weak than the argument opposing retroactivity we rejected in *Rogers*. Unlike the year and a day rule at issue in *Rogers*, the diminished-capacity defense is not an "outdated relic of the common law" widely rejected by modern courts and

legislators. 532 U. S., at 462. To the contrary, the Model Penal Code sets out a version of the defense. See ALI, Model Penal Code §4.02(1), pp. 216–217 (1985) ("Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did or did not have a state of mind that is an element of the offense."). See also *id.*, Comment 2, at 219 ("The Institute perceived no justification for a limitation on evidence that may bear significantly on a determination of the mental state of the defendant at the time of the commission of the crime."). And not long before the 1993 shooting at issue here, the American Bar Association had approved criminal-justice guidelines that (1) favored the admissibility of mental-health evidence offered to negate *mens rea*, and (2) reported that a majority of States allowed presentation of such evidence in at least some circumstances. See ABA Criminal Justice Mental Health Standards §7–6.2, and Commentary, pp. 347–349, and n. 2 (1989). See also *Clark* v. *Arizona*, 548 U. S. 735, 800 (2006) (KENNEDY, J., dissenting) (reporting that in 2006, "a substantial majority of the States" permitted the introduction of "mental-illness evidence to negate *mens rea*").

Furthermore, the year and a day rule was mentioned only three times in dicta in Tennessee reported decisions. *Rogers*, 532 U. S., at 464. The diminished-capacity defense, by contrast, had been adhered to repeatedly by the Michigan Court of Appeals. See *supra,* at 8–10. It had also been "'acknowledged in passing'" in Michigan Supreme Court decisions and was reflected in the Michigan State Bar's pattern jury instructions. 683 F. 3d, at 746–749 (quoting *Carpenter*, 464 Mich., at 232, 627 N. W. 2d, at 281).

These considerations, however, are hardly sufficient to warrant federal habeas relief under 28 U. S. C. §2254(d)(1)'s demanding standard. See *Williams* v. *Taylor*, 529 U. S. 362, 410 (2000) ("[A]n *unreasonable* applica-

tion of federal law is different from an *incorrect* application of federal law."). *Rogers* did not hold that a newly announced judicial rule may be applied retroactively only if the rule it replaces was an "outdated relic" rarely appearing in a jurisdiction's case law. 532 U. S., at 462–467. Distinguishing *Rogers*, a case in which we *rejected* a due process claim, thus does little to bolster Lancaster's argument that the Michigan Court of Appeals' decision unreasonably applied clearly established federal law. See *Williams*, 529 U. S., at 412 (the phrase "clearly established [f]ederal law" in §2254(d)(1) "refers to the *holdings . . .* of this Court's decisions as of the time of the relevant state-court decision" (emphasis added)).

This Court has never found a due process violation in circumstances remotely resembling Lancaster's case—*i.e.*, where a state supreme court, squarely addressing a particular issue for the first time, rejected a consistent line of lower court decisions based on the supreme court's reasonable interpretation of the language of a controlling statute. Fairminded jurists could conclude that a state supreme court decision of that order is not "unexpected and indefensible by reference to [existing] law." *Rogers*, 532 U. S., at 462 (internal quotation marks omitted). Lancaster therefore is not entitled to federal habeas relief on his due process claim.

\*    \*    \*

For the reasons stated, the judgment of the Court of Appeals for the Sixth Circuit is

*Reversed.*