[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-13966

_____

TAVARES J WRIGHT,

Petitioner-Appellant,

*versus*

SECRETARY,    DEPARTMENT    OF    CORRECTIONS,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:17-cv-00974-WFJ-TGW

_____

Before WILLIAM PRYOR, Chief Judge, JORDAN, and LUCK, Circuit Judges.

PER CURIAM:

In April of 2000, as part of a multi-day crime spree involving burglary, attempted murder, and carjacking, Tavares Wright and Samuel Pitts kidnapped David Green and James Felker in Lakeland, Florida. Shortly after the kidnappings, Mr. Wright murdered Mr. Green and Mr. Felker. *See Wright v. State*, 19 So.3d 277, 283–91 (Fla. 2009) (*Wright I*) (setting out the chronology of the crimes in detail).

After two mistrials, Mr. Wright was eventually convicted for those murders. He received two death sentences based on his convictions, and he now appeals the district court's denial of his habeas corpus petition, which was filed pursuant to 28 U.S.C. § 2254.

We granted Mr. Wright a certificate of appealability on whether he is intellectually disabled and therefore ineligible for the death penalty under the Eighth Amendment. Following a review of the record, and with the benefit of oral argument, we affirm the district court's denial of habeas relief on the intellectual disability claim.[1]

---

[1] As we write for the parties, we assume their familiarity with the record. We therefore set out the procedural history and the facts only as necessary to explain our decision.

## I

Florida defines intellectual disability as "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18." Fla. Stat. § 921.137(1) (2021). As Mr. Wright acknowledges, *see* Appellant's Br. at 9, this definition comports with the standard set out by the Supreme Court in *Hall v. Florida*, 572 U.S. 701, 710 (2014).

On post-conviction review, the Florida Supreme Court found that Mr. Wright is not intellectually disabled, but the United States Supreme Court vacated and remanded for consideration of the intellectual disability issue in light of *Moore v. Texas*, 137 S. Ct. 1039 (2017). *See Wright v. State*, 213 So.3d 881 (Fla. 2017) (*Wright II*), *vacated and remanded*, 138 S. Ct. 360 (2017) (Mem). On remand, the Florida Supreme Court again concluded that Mr. Wright is not intellectually disabled for two reasons. First, he "failed to prove significant subaverage intellectual functioning by clear and convincing evidence. For instance, on his July 15, 2005, IQ test, [he] scored an 82 with a range of 79-86, which is well above the approximation for [intellectual disability]." *Wright v. State*, 256 So.3d 766, 772 (Fla. 2018) (*Wright III*). Second, he "failed to prove adaptive deficits by clear and convincing evidence." *Id.* at 778.

## II

After the Florida Supreme Court's decision in *Wright III*, the district court denied Mr. Wright's amended petition for habeas relief. With respect to the Eighth Amendment intellectual disability

claim—which is the only claim before us—the district court concluded that it reasonably determined that Mr. Wright was not intellectually disabled for Eighth Amendment purposes, and that the Florida Supreme Court came to that determination in a manner consistent with controlling U.S. Supreme Court precedent.

On appeal, Mr. Wright asserts that the district court erred. First, he argues that the state court record proves by clear and convincing evidence that he is intellectually disabled and therefore ineligible for execution under the Eighth Amendment, as interpreted by *Atkins v. Virginia*, 536 U.S. 304 (2002). Second, and relatedly, he argues that the Florida Supreme Court's resolution of his intellectual disability claim was an unreasonable application of clearly established law as set forth in *Atkins, Hall,* and *Moore.*

### III

The district court's denial of Mr. Wright's habeas petition is subject to plenary review. *See Fults v. GDCP Warden*, 764 F.3d 1311, 1313 (11th Cir. 2014). But under the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (1996), Mr. Wright is entitled to relief only if the Florida Supreme Court's adjudication of his intellectual disability claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or was "based on an unreasonable determination of facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2). This standard is "difficult to meet." *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013) (internal quotation marks omitted).

A defendant in Florida must demonstrate intellectual disability by clear and convincing evidence. *See* Fla. Stat. § 921.137(4). A determination as to intellectual disability is a finding of fact. *See Fults*, 764 F.3d at 1319. As a result, the Florida Supreme Court's finding that Mr. Wright is not intellectually disabled is "presumed to be correct," and he has the burden of "rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). *See Fults*, 764 F.3d at 1319.

Mr. Wright's factual and legal arguments are intertwined. For purposes of clarity, we will first address the contention that the Florida Supreme Court unreasonably applied clearly established federal law. We will then consider the assertion that the Florida Supreme Court made an unreasonable determination of fact in concluding that he is not intellectually disabled.

## IV

On the legal side, Mr. Wright does not claim that the Florida Supreme Court's decision in *Wright III* was contrary to clearly established federal law; rather, he argues that it was an unreasonable application of that law. Under § 2254(d)(1)'s unreasonable-application clause, a prisoner is entitled to habeas relief only if "the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the case." *Fults*, 764 F.3d at 1314 (cleaned up and citation omitted). An unreasonable application of clearly established federal law "must be objectively unreasonable, not merely wrong." *White v. Woodall*, 572 U.S. 415, 419 (2014) (internal quotation

marks and citation omitted). "[E]ven clear error will not suffice." *Id.* (internal quotation marks and citation omitted). So, to obtain habeas relief, a "prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair[-]minded disagreement." *Id.* at 419–20 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

Again, Mr. Wright contends that the Florida Supreme Court unreasonably applied the legal principles established in *Atkins*, *Hall*, and *Moore* to the facts of his case. As explained below, we disagree.

## A

In *Atkins*, the Supreme Court held that executing intellectually disabled individuals violates Eighth Amendment protections against cruel and unusual punishment. But it tasked the states with developing appropriate ways to enforce this constitutionally-mandated restriction. *See* 536 U.S. at 317.

The Court in *Hall* clarified that states do not have "unfettered discretion to define the full scope of the constitutional protection," but instead must establish a legal framework for determining intellectual disability that is "informed by the medical community's diagnostic framework." *Hall*, 572 U.S. at 719–21 (striking down Florida's strict IQ cutoff as conclusive of intellectual disability without allowing for consideration of other evidence that may indicate intellectual disability).

*Hall* recognized, consistent with clinical standards, that IQ scores are imprecise and best measured as a range rather than a single numerical score. *See id.* at 720. It further made clear that "when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." *Id.* at 723. And it reaffirmed, as noted in *Atkins*, that "the medical community defines intellectual disability according to three criteria: significantly subaverage intellectual functioning, deficits in adaptive functioning (the inability to learn basic skills and adjust behavior to changing circumstances), and onset of these deficits during the developmental period." *Id.* at 710.

*Moore* then expanded on the second criterion of this definition and emphasized the importance of adhering to contemporary clinical standards in analyzing adaptive deficits. *See Moore*, 137 S. Ct. at 1053. There, a Texas appellate court had denied a defendant relief after relying on a seven-factor judicial test for determining intellectual disability. *See id.* at 1051 (rejecting the application of those factors to determine intellectual disability). The Supreme Court noted that the seven-factor test advanced lay perceptions—and outdated ones at that—of intellectual disability. *See id.* It rejected this approach as inconsistent with the rule established in *Hall*, and it criticized the Texas appellate court's analysis of Bobby Moore's adaptive functioning for "deviat[ing] from prevailing

clinical standards and from the older clinical standards the court claimed to apply." *Id.* at 1050.

The Texas appellate court, the Supreme Court explained, had "overemphasized [Mr.] Moore's perceived adaptive strengths" when it concluded that he did not suffer significant adaptive deficits. *Id.* This was problematic because "the medical community focuses the adaptive-functioning inquiry on adaptive *deficits.*" *Id.* (emphasis in original).

*Moore* was in many ways a straightforward application of *Hall*. But it also emphasized that adaptive deficits—specifically, "significant limitations in conceptual, social, or practical adaptive skills," *id.* (quoting American Association on Intellectual and Developmental Disabilities, Intellectual Disability: Definition, Classification, and Systems of Supports 47 (11th ed. 2010) (AAIDD-11)), are "not outweighed by the potential strengths in some adaptive skills." *Id. See also id.* ("deficits in only one of the three adaptive-skills domains suffice to show adaptive deficits") (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 38 (5th ed. 2013) (DSM-5)).

With these legal principles in mind, we now turn to the Florida Supreme Court's decision in *Wright III*.

## B

Mr. Wright first challenges the Florida Supreme Court's finding with respect to prong one of the Florida statute, which mimics the first criterion of the widely accepted diagnostic

framework: significantly subaverage general intellectual functioning. *See* Fla. Stat. § 921.137(1). The Florida statute defines the statutory phrase "significantly subaverage general intellectual functioning" as "performance that is two or more standard deviations from the mean score on a standardized intelligence test." *Id.* The medical approximation of significant subaverage intellectual functioning is therefore an IQ score of 70, give or take. But *Hall*, of course, instructs that courts must account for a standard error of measurement (SEM), which here is a range of plus or minus five points. *See Hall,* 572 U.S. at 720. *See also* DSM-5, at 37.

The record reflects that Mr. Wright took a total of nine IQ tests, beginning at age 10. We consider six of these tests in determining whether Mr. Wright had subaverage intellectual functioning for the purpose of capital sentencing, and these six reported scores are between 75 and 82. *See* Appellant's Br. at 13–15.[2]

---

[2] Two of the nine tests were Weschler Abbreviated Scale of Intelligence (WASI) tests, which Mr. Wright contends cannot be considered in the context of capital punishment because the WASI is not explicitly listed as a permissible test in Fla. Admin. Code. R. 65G-4.011(1). *See* Appellant's Br. at 14 n. 10. We assume, without deciding, that the WASI tests should not be taken into account because even without these tests Mr. Wright's contention fails.

A third test score, administered in 2014 while Mr. Wright was incarcerated, was unusually low. This was due (depending on which version of the facts one believes) to either Mr. Wright's malingering or the state expert's use of a non-standardized test procedure which fatigues the test taker. Again, we assume for the sake of argument that this third test also should not be considered.

Accounting for the SEM in a manner most favorable to Mr. Wright (in other words, assuming every test score was improperly inflated by five points), he still scored above 70 on all but two of the tests. *See* D.E. 36 at 15, 89, 102–03. This led the postconviction trial court, after remand due to *Hall,* to find that these IQ scores did not demonstrate by clear and convincing evidence that Mr. Wright had significant subaverage general intellectual functioning. *See* D.E. 37 at 122. As we explained earlier, the Florida Supreme Court ruled in *Wright III* that this finding was supported by substantial evidence. *See* 256 So.3d at 772.

Mr. Wright now asserts that the Florida Supreme Court in *Wright III* disregarded *Hall* and instead misconstrued IQ as a single number (rather than a range) when it focused on his highest score of 82 and failed to explicitly mention any of his other scores. This is an incorrect reading of *Hall*—and of *Wright III*—for a couple of reasons.

First, even when Florida courts used the strict-cutoff rule for determining intellectual disability (the approach struck down in *Hall*), they still considered multiple scores. *See Hall*, 572 U.S. at 734 (Alito, J., dissenting) (noting that Florida accounted for risk of error by analyzing multiple test results). *Hall* did not establish any rule regarding how to weigh IQ tests when a person takes several of them; it instead held that "[e]ven when a person has taken multiple tests, each separate score must be assessed using the SEM . . . ." *Id.* at 714. And that is precisely what the Florida Supreme Court in *Wright III* did with respect to Mr. Wright's highest score of 82—it noted this score reflected "a range of 79-86, which is well above the

20-13966                Opinion of the Court                11

approximation for [intellectual disability]." *Wright III*, 256 So.3d at 772.

Second, the Florida Supreme Court did not limit its analysis to Mr. Wright's highest score of 82. It noted in *Wright III* that the most favorable evidence of Mr. Wright's IQ range, adjusted for the SEM, "dipped 1 point beneath 70" at "the lowest end of the range." *Id*. It also referenced "numerous IQ test scores above 70," and considered testimony from two competing experts. *Id*.

On this record we cannot conclude that *Wright III* was an unreasonable application of *Hall*. This is particularly so because the postconviction trial court found that though Mr. Wright failed to establish subaverage intellectual functioning, his scores did "fall within the test's acknowledged and inherent margin of error," and he therefore was entitled to present evidence of adaptive deficits. *See* D.E. 37 at 122. And this is consistent with *Hall*. The Florida courts' approach here did not "fail[] to take into account the standard error of measurement;" nor did it "bar[] an essential part of a sentencing court's inquiry into adaptive functioning." *Hall*, 572 U.S. at 724 (Alito, J., dissenting). Instead, the record reflects that Mr. Wright "ha[d] the opportunity to present evidence of his intellectual disability, including deficits in adaptive functioning over his lifetime." *Id*.

## C

Before we turn to the arguments regarding the adaptive-deficits prong, we will consider one final claim Mr. Wright raises with respect to the subaverage-intellectual-functioning prong. Mr.

Wright asserts that the Florida courts unreasonably applied the *Hall* command that the legal determination of intellectual disability be "informed by the medical community's diagnostic framework" by failing to account for the so-called Flynn effect. *See* 572 U.S. at 721. The Flynn effect describes an upward drift in IQ scores over time. Under this theory, a person's score can be artificially higher if he takes an IQ test several years after the test was normed on the population. *See Raulerson v. Warden,* 928 F.3d 987, 1008 (11th Cir. 2019*). See also* AAIDD-11, at 37 ("Because Flynn reported that mean IQ increases about 0.33 points per year, some investigators have suggested that any obtained IQ score should be adjusted 0.33 points for each year the test was administered after the standardization was completed.") (cleaned up).

Mr. Wright first took an IQ test at age 10, in 1991, and he received a score of 76. Dr. Mary Kasper, an expert witness for the defense, testified that the IQ test he took that year was normed on the population in 1972, 19 years before the test. With a Flynn adjustment, Mr. Wright's first score would therefore be 70. And his score of 75, which he received at age 16 in 1997, would drop down to a 69. Mr. Wright says that these scores are the most accurate and reliable indicators of his true IQ.

We have, as Mr. Wright recognizes, previously held that courts need not "accept and apply the Flynn effect." *Ledford v. Warden, Ga. Diagnostic and Classification Prison,* 818 F.3d 600, 636 (11th Cir. 2016). *See also id.* at 637 ("[O]ur Circuit . . . leaves it to the fact-finder court to hear and consider the Flynn effect

evidence and to make its own fact-findings about the credibility and weight of the expert evidence regarding the Flynn effect."). And we have observed that "there is no consensus about the Flynn effect among experts or among the courts." *Raulerson*, 928 F.3d at 1008. Mr. Wright contends that there is now a general consensus in the clinical manuals that Flynn adjustments are the best practice—but he also acknowledges that not every expert in the field of intellectual disability holds the same opinion. *Compare* Leigh D. Hagan et al., *IQ Scores Should Not Be Adjusted for the Flynn Effect in Capital Punishment Cases*, 28 Journal of Psychoeducational Assessment 474 (2010), *with* Jack M. Fletcher, et al., *IQ Scores Should Be Corrected for the Flynn Effect in High-Stakes Decisions*, 28 Journal of Psychoeducational Assessment 469 (2010).

Only five years have elapsed since we rejected the same argument from the defendant in *Ledford*, *see* 818 F.3d at 637–39, and we are not persuaded that the medical consensus has changed since then. Indeed, one of the clinical manuals that Mr. Wright cites to buttress his Flynn-effect argument is the same edition of the same clinical manual cited by the defendant in *Ledford*—the DSM-5. *See Ledford*, 818 F.3d at 637.

Mr. Wright also cites to the AAIDD-11, which does not appear to have been part of the evidentiary record in *Ledford*. But that alone does not convince us that the general medical consensus has changed. Just two years ago, in *Raulerson*, we again rejected a Flynn-effect argument, explaining that "[n]o adjustment for the Flynn effect is required in this Circuit." *Raulerson*, 928 F.3d at 1008

(noting that two psychologists who had administered the defendant's IQ tests "testified that they would not apply the Flynn effect to the scores"). Mr. Wright acknowledges the holdings in *Ledford* and *Raulerson*, and then asks us to reach a different conclusion. But he does not in his brief attempt to explain how the medical consensus has changed since those cases. And if nothing has changed, *Ledford* and *Raulerson* constitute binding precedent for us as a later panel.

Having concluded that the Florida Supreme Court in *Wright III* did not unreasonably apply clearly established federal law in analyzing the intellectual-functioning prong, we now turn to Mr. Wright's arguments concerning the adaptive-deficits prong.

## D

Mr. Wright contends that the district court erred in its analysis of adaptive deficits—the second prong of both the Florida statute and the widely accepted diagnostic framework. As *Moore* recognized, "the medical community focuses the adaptive-functioning inquiry on adaptive *deficits*," rather than adaptive strengths. 137 S. Ct. at 1050. Adaptive deficits are defined as "the inability to learn basic skills and adjust behavior to changing circumstances." *Hall*, 572 U.S. at 710. *Moore* cautioned courts, pursuant to clinical recommendations, to not focus too heavily "on adaptive strengths developed 'in a controlled setting,'" such as a prison. 137 S. Ct. at 1050 (citations omitted).

The DSM-5 and the AAIDD-11 divide adaptive functioning into three categories: conceptual, social, and practical. *See* AAIDD-11, at 43; DSM-5, at 37. Adaptive deficits exist when at least one of the three domains "is sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings at school, at work, at home, or in the community." DSM-5, at 38.

According to Mr. Wright, the Florida Supreme Court in *Wright III* unreasonably applied *Moore* by overemphasizing expert- and lay-witness testimony of his perceived adaptive strengths while disregarding evidence of his deficits in all three categories of adaptive behavior. The Florida Supreme Court compounded this error, Mr. Wright argues, by relying too heavily on his prison behavior in its analysis.

The Florida Supreme Court noted that *Moore* was unclear in instructing courts as to what degree of emphasis on adaptive strengths constitutes overemphasis. It described "the difficult position that the States are placed in due to the Supreme Court's lack of clear guidance on this analysis" and due to its directive that states should "interpret and follow two clinical manuals that caution people like us from making untrained ID diagnoses." *Wright III*, 256 So.3d at 776 n.9. While acknowledging that *Wright II* had indeed discussed some of Mr. Wright's adaptive strengths and behavior in prison, the Florida Supreme Court nonetheless concluded in *Wright III* that the decision in *Wright II* boiled down to "the competing expert medical testimony of [state expert] Dr. Gamache and

[defense expert] Dr. Kasper," whose testimony was based on "current medical standards." *Id.* at 775, 777. Notably, the Florida Supreme Court in *Wright III* found that *Wright II* did not "independently weigh[ ] strengths and deficits," like the Texas appellate court had done in *Moore*, nor did it base its decision on outdated standards and nonclinical factors. *Id.*

The Florida Supreme Court did not unreasonably apply *Moore*. Though *Wright III* certainly criticized *Moore*, it also spent several pages distinguishing its decision in *Wright II* from the Texas appellate court's decision in *Moore*. And the distinctions it made were plausible. For example, with respect to the overemphasis-on-adaptive-strengths issue, the Florida Supreme Court pointed out that even though it considered some expert testimony that detailed strengths in certain areas, "much of the evidence that the [*Wright II*] opinion detailed was directly relevant to the conceptual domain," whereas the Texas appellate court in *Moore* had "used completely unrelated adaptive strengths . . . to outweigh the extensive evidence of adaptive deficits in all three domains." *Id.* at 777 (citing *Moore*, 137 S. Ct. at 1045–47). The key difference, as the Florida Supreme Court saw it, was that in *Wright II* it did not "arbitrarily offset deficits with unconnected strengths" but instead "relied on expert testimony with regard to connected adaptive deficits and the postconviction court's credibility determinations." *Id.*

This is not an unreasonable application of *Moore*. The record does not reflect that there was overwhelming evidence of

adaptive deficits that the Florida Supreme Court disregarded in favor of lay perceptions about adaptive strengths.

With respect to the prison-behavior issue, the Florida Supreme Court in *Wright III* again criticized *Moore*, noting that it is likewise difficult to know where the Supreme Court drew the line for reliance on prison conduct. *See* 256 So.3d at 777–78. It then pointed out that the only portion of its decision in *Wright II* where it discussed prison conduct was when it recited the findings of the state expert, Dr. Gamache. *Id.* at 777. Mr. Wright asserts that Dr. Gamache primarily based his opinion on a single interview with him while he was imprisoned, and that therefore the Florida Supreme Court's reliance on this opinion contradicts *Moore*.

We do not agree. In addition to what we've summarized, the Florida Supreme Court relied heavily on evidence from outside of the prison context—and, to the extent that it relied on some behavior within the prison, it did not stress "improved behavior in prison" the way that the Texas appellate court did in *Moore*. 137 S. Ct. at 1050. Indeed, it was this "improved behavior in prison" that the Texas appellate court in *Moore* used to justify disregarding evidence of adaptive deficits from earlier in the defendant's life. *Id.* The Florida Supreme Court, on the other hand, "merely listed connected facts that Dr. Gamache relied upon to render his medical conclusion that [Mr.] Wright does not have adaptive deficits." *Wright III*, 256 So.3d at 777.

It is also worth pointing out that the Supreme Court decided *Moore* on direct review, rather than on federal collateral review,

where AEDPA requires substantial deference. *See Clemons v. Commissioner, Al. Department of Corrections*, 967 F.3d 1231, 1250 (11th Cir. 2020). Here we must find not only that the Florida Supreme Court erred, but that its application of *Moore* was "objectively unreasonable," *White*, 572 U.S. at 419 (internal quotation marks omitted), and we are confident that it was not.

## V

On the factual side, Mr. Wright argues that the state court record proves by clear and convincing evidence that he is intellectually disabled and thus ineligible for execution under *Atkins*, 536 U.S. 304. We conclude that the Florida Supreme Court's finding to the contrary was not an unreasonable determination of fact in light of the evidence presented in the state court proceedings and that Mr. Wright has not rebutted by clear and convincing evidence the presumption of correctness given to that factual finding.

Mr. Wright acknowledges that he has a mild level of disability but argues that it nonetheless precludes his execution. As discussed earlier, he asserts that the postconviction trial court improperly interpreted his IQ scores, and that the scores he received should not be given equal evidentiary weight. In fact, he says, the postconviction trial court should have discounted four of them as unreliable indicators of his IQ because they were either artificially inflated by the practice effect or because he achieved them after the developmental stage.

In analyzing the subaverage intellectual functioning prong, the postconviction court considered competing expert testimony from Dr. Kasper and Dr. Gamache, as well as numerous IQ scores above 70 (after SEM adjustments) to determine that there was competent and substantial evidence for it to find that Mr. Wright "failed to prove significant subaverage intellectual functioning." *See Wright III*, 256 So.3d at 772. For several reasons, this was not an unreasonable determination of fact.

First, as we said above, the medical approximation of significant subaverage intellectual functioning is an IQ score of 70, give or take. Mr. Wright's scores ranged from 75 to 82. Even accounting for the SEM adjustment, it was not unreasonable for the postconviction court and the Florida Supreme Court to find, based on Mr. Wright's scores, that he did not meet the significant subaverage intellectual functioning prong. *Cf. Clemons*, 967 F.3d at 1248–49 (state court's finding that defendant failed to show significantly subaverage intellectual functioning when his scores ranged from 51 to 84 was not an unreasonable determination of fact).

Second, the state's expert, Dr. Gamache—who administered one of Mr. Wright's IQ tests—had expressed concerns in his testimony that Mr. Wright malingered on both that test and his previous tests. He also opined that "one can malinger and fake a low IQ" but one "cannot fake a higher IQ." *Wright II*, 213 So.3d at 898. This testimony could reasonably be viewed by the postconviction trial court as more credible and persuasive than that of Mr. Wright's expert, Dr. Kasper, who testified about the practice effect. *Cf.*

*Clemons*, 967 F.3d at 1249 (allowing state courts to take into account expert opinions that the defendant was malingering).

The postconviction trial court also considered Dr. Kasper's testimony regarding the practice effect. Dr. Kasper testified that the most accurate range of scores for Mr. Wright was derived from his first IQ examination in 1991, which yielded a score of 76 (between a 69 and 82, she testified, if one applies the SEM to a 95 percent confidence interval). *See Wright II*, 213 So.3d at 897–98. And even Dr. Kasper conceded that the score of 82 was within the 95 percent confidence interval she determined from applying the SEM to Mr. Wright's first exam. *See id.* at 898. Based on this testimony, and the scores themselves, we cannot conclude that the postconviction trial court made an unreasonable determination of fact with respect to the subaverage-intellectual-functioning prong, or that the Florida Supreme Court erred in affirming that finding.

The same is true of the postconviction trial court's factual findings regarding the adaptive-deficits prong. Here, again, the postconviction trial court was faced with "the competing expert medical testimony of Dr. Gamache and Dr. Kasper," *Wright III*, 256 So.3d at 777, and it chose to credit Dr. Gamache's testimony over Dr. Kasper's. Dr. Gamache testified that Mr. Wright has some deficits in reading and writing skills but attributed them to a lack of education and a learning disability rather than to an intellectual disability. *See Wright II*, 213 So.3d at 899. Dr. Gamache did point to some adaptive strengths in explaining why these deficits do not rise to the level required for a determination of intellectual disability.

*See id.* at 899–900. But, as explained above, we think it is reasonable to read *Moore* as stopping short of precluding courts from considering *any* evidence of adaptive strengths, especially when those adaptive strengths are directly relevant—in an expert's view—to disproving adaptive deficits.

The postconviction trial court also explained at length why it disregarded the testimony of Mr. Wright's expert, Dr. Kasper, who had conceded that she had not administered the standardized test for adaptive functioning in "the normal way." *Id.* at 900. This gave the court "great pause in considering its validity," and we do not view that as an unreasonable determination of fact. *Id.* As a result, the denial of Mr. Wright's intellectual disability claim by the postconviction trial court and the Florida Supreme Court in *Wright III* was not based on an unreasonable determination of the facts.

## VI

We affirm the district court's denial of Mr. Wright's petition for a writ of habeas corpus.

AFFIRMED.