PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
———

No. 19-2228
———

GRAHAM B. SPANIER

v.

DIRECTOR DAUPHIN COUNTY PROBATION
SERVICES;
ATTORNEY GENERAL PENNSYLVANIA,
                                        Appellants
———

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D. C. No. 3-19-cv-00523)
Magistrate Judge:  Honorable Karoline Mehalchick

———

Argued June 16, 2020
Before:  CHAGARES, PORTER and FISHER, *Circuit
Judges*.

(Filed: December 1, 2020)

Kimberly A. Boyer-Cohen
Marshall Dennehey Warner Coleman & Goggin
2000 Market Street, Suite 2300
Philadelphia, PA 19103

Ronald Eisenberg [ARGUED]
Office of Attorney General of Pennsylvania
1600 Arch Street, Suite 300
Philadelphia, PA 19103
    *Counsel for Appellants*

Bruce P. Merenstein [ARGUED]
Samuel W. Silver
Schnader Harrison Segal & Lewis
1600 Market Street, Suite 3600
Philadelphia, PA 19103
    *Counsel for Appellee*

―――

OPINION OF THE COURT

―――

FISHER, *Circuit Judge*.

This case stems from the disturbing child sex abuse scandal involving the football program at the Pennsylvania State University. In 2017, Penn State's former president, Graham Spanier, was convicted of child endangerment for his role in the decision not to report the suspected abuse to state

2

authorities. Spanier and other university administrators made that decision in 2001. However, after their decision and before Spanier's trial—in 2007, to be exact—the Pennsylvania legislature amended the statutory definition of child endangerment and its statute of limitations. Although Spanier's conduct preceded these amendments, the jury was instructed in language that tracked the post-amendment statute.

Spanier challenged his state-court conviction through a petition for a writ of habeas corpus, arguing that his rights under the Due Process and Ex Post Facto Clauses were violated. He also argued that his due process rights were violated by the application of an exception to the statute of limitations. The District Court granted Spanier's petition and vacated his conviction. The Commonwealth appeals. We will reverse.

I.

A. Factual History: Spanier's Conduct

In 1998, a woman called the Penn State police to complain that her eleven-year-old son had showered with Jerry Sandusky, who was the well-known defensive coordinator for Penn State's football team. The boy was involved with the Second Mile program, a charitable organization Sandusky founded that helped vulnerable youth. The police chief brought news of the complaint to Gary Schultz, Penn State's Senior Vice President for Finance and Business. The chief kept Schultz informed, and Schultz in turn told Spanier the details of the investigation as it unfolded. Schultz also told Timothy Curley, the university's Athletic Director, about the investigation.

Both the Penn State police and the Pennsylvania Department of Public Welfare investigated the complaint. Ultimately, those entities concluded that sexual assault could

3

not be proven, and the DA did not file charges. Spanier was copied on two emails about the investigation: one at the beginning and one saying it had concluded.

In 1999, Sandusky retired. He was granted emeritus status, and he still had access to Penn State football facilities. He also remained actively involved with Second Mile.

On Friday, February 9, 2001, around 8:00 or 8:30 in the evening, graduate assistant coach Michael McQueary went to the football building. He saw Sandusky and a boy he estimated to be "[r]oughly 10 to 12 years old" naked together in the shower, clearly engaged in sexual activity. App. 806. Shaken, he immediately spoke with his father and a family friend. The next morning, Saturday, February 10, McQueary told longtime head football coach Joe Paterno. Paterno asked to meet with Athletic Director Curley and Senior Vice President Schultz. The three men spoke a day later, on Sunday, February 11. Paterno reported what McQueary had told him, but he used the terms "horseplay" and "wrestling" to describe what McQueary saw. App. 1056. Later that day, Schultz asked Penn State's general counsel for advice. Counsel recommended that the University report the incident to the Department of Public Welfare.

On Monday, February 12, Curley and Schultz reported the situation to Spanier. According to Schultz's contemporaneous notes, the three men "reviewed 1998 history," i.e., the 1998 investigation; they "agreed [Curley] will . . . advise [Paterno] we think [Curley] should meet [with] [Sandusky] on Friday"; they decided that "unless [Sandusky] 'confesses' to having a problem, [Curley] will indicate we need to have DPW [the Department of Public Welfare] review the matter"; and "[Curley] will keep [Schultz] posted." App. 1379.

The next week, Curley and Schultz asked McQueary to meet with them, and McQueary again described what he had

4

seen. McQueary testified, "I told them that I saw Jerry molesting a boy, that what he was doing in a shower with a minor on the Friday night was sexual, it was over the line." App. 816. McQueary vigorously denied ever using the word "horseplay" to describe the incident to anyone.

Two weeks later, on Sunday, February 25, 2001, Curley and Schultz again met with Spanier. After the meeting, Schultz found an online listing of Second Mile's board of directors, printed it out, and wrote three action items on the back: "Tell Chair of Board of Second Mile," "Report to Dept of Welfare," and "Tell [Sandusky] to avoid bringing children alone into [football] Bldg." App. 1151, 1393-94. Schultz emailed Curley the next day to confirm that Curley "[had] the ball" on these next steps. App. 1382, 1143-44.

On Tuesday, February 27, however, Curley emailed Spanier and Schultz and shared that he'd had a change of heart:

> After giving it more thought and talking it over with Joe [Paterno] yesterday—I am uncomfortable with what we agreed were the next steps. I am having trouble with going to everyone, but the person involved. I think I would be more comfortable meeting with the person and tell[ing] him about the information we received. I would plan to tell him we are aware of the first situation [the 1998 incident]. I would indicate we feel there is a problem and we want to assist the individual to get professional help. Also, we feel a responsibility at some point soon to inform his organization [Second Mile] and . . . maybe the other one [child protective services] about the situation. If he is cooperative we would work with him to handle informing the organization [Second Mile]. If not, we do not

5

have a choice and will inform the two groups. Additionally, I will let him know that his guests [Second Mile children] are not permitted to use our facilities. I need some help on this one. What do you think about this approach?

App. 1386, 1075-81. Spanier responded:

This approach is acceptable to me. It requires you to go a step further and means that your conversation will be all the more difficult, but I admire your willingness to do that and I am supportive. The only downside for us is if the message isn't heard and acted upon, and we then become vulnerable for not having reported it. But that can be assessed down the road. The approach you outline is humane and a reasonable way to proceed.

App. 1386, 1082-83. As agreed, Curley spoke with Sandusky and Second Mile's executive director. Then Curley circled back to Spanier and "told him I took care of what I was supposed to do and everything was okay." App. 1092. The Department of Public Welfare was never notified.

After this point in early 2001, the Sandusky saga went quiet—at least as far as Penn State's administration was concerned. But that was not the experience of the children Sandusky continued to abuse. In 2008, Clinton County Children and Youth Services received another report and the Commonwealth began another investigation. As a result of this investigation, Sandusky was convicted of crimes related to his abuse of several children, including four he abused after 2001.

6

## B. Legal Backdrop: The Amendment of Pennsylvania's Child Endangerment Statute and the Pennsylvania Supreme Court's Decision in *Commonwealth v. Lynn*

Before turning to the procedural history of this appeal, we first introduce its legal backdrop, which is encapsulated in *Commonwealth v. Lynn*, 114 A.3d 796 (Pa. 2015). This discussion is necessary to explain the circumstances of Spanier's conviction.

William Lynn, a Roman Catholic priest, was the Secretary for Clergy of the Archdiocese of Philadelphia in the 1990s and early 2000s. *Id.* at 798. He "was responsible for . . . handling clergy sexual abuse issues," acting as the "'point man' in the investigation into . . . allegations of clergy sexual abuse of minors within the Archdiocese." *Id.* at 798-99. While Lynn was Secretary for Clergy, priests in the diocese sexually abused children. Some children were victimized by priests who, Lynn knew, had abused other children in the past. *Id.* at 799-806.

In 2002, a grand jury was empaneled at the request of the Philadelphia District Attorney to investigate clergy sex abuse in the diocese. *Id.* at 806-07. The grand jury's report concluded that the 1995 version of the Pennsylvania child endangerment statute, 18 Pa. C.S. § 4304, which was then in effect, "allowed church officials such as [Lynn] to escape criminal liability." *Id.* at 807. The grand jury explained that the statute was "too narrow to support a successful prosecution of the decision-makers who were running the Archdiocese. The statute confines its coverage to parents, guardians, and other persons 'supervising the welfare of a child.' High level Archdiocesan officials, however, were far removed from any direct contact with children." *Id.* (citation omitted).

Based on its understanding of the statute, the grand jury did not recommend criminal charges against Lynn. Instead, it

7

recommended amending the child endangerment statute "to encompass conduct by individuals in an employer or supervising capacity." *Id.* "[T]he legislature obliged, and amended the . . . statute, effective January 27, 2007." *Id.* The 2007 amendment added new language, which is underlined here:

(a) Offense defined.--

(1) A parent, guardian or other person supervising the welfare of a child under 18 years of age, or a person that employs or supervises such a person, commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support.

(2) A person commits an offense if the person, in an official capacity, prevents or interferes with the making of a report of suspected child abuse under 23 Pa.C.S. Ch. 63 (relating to child protective services).

(3) As used in this subsection, the term "person supervising the welfare of a child" means a person other than a parent or guardian that provides care, education, training or control of a child.

(b) Grading.--An offense under this section constitutes a misdemeanor of the first degree. However, where there is a course of conduct of endangering the welfare of a child, the offense constitutes a felony of the third degree.

8

18 Pa. C.S. § 4304 (2007) (emphasis added). The Pennsylvania legislature also amended the statute of limitations for § 4304, adding the underlined language:

> (a) General rule.--Except as otherwise provided in this subchapter, a prosecution for an offense must be commenced within two years after it is committed. . . .
>
> (c) Exceptions.--If the period prescribed in subsection (a) . . . has expired, a prosecution may nevertheless be commenced for: . . .
>
>> (3) Any sexual offense committed against a minor who is less than 18 years of age any time up to <u>the later of</u> the period of limitation provided by law after the minor has reached 18 years of age <u>or the date the minor reaches 50 years of age</u>. As used in this paragraph, the term "sexual offense" [includes] a crime under . . . [18 Pa. C.S.] Section 4304 (relating to endangering welfare of children).

42 Pa. C.S. § 5552 (2007) (emphasis added).

Despite the grand jury's hesitations about charging Lynn under the 1995 statute, the Commonwealth decided to do so in 2011. *Lynn*, 114 A.3d at 807-08. Lynn was convicted and he appealed, arguing that the evidence was insufficient because he did not supervise children and therefore was not within the scope of the 1995 statute. *Id.* at 815-16. The Superior Court agreed and reversed the conviction. *Id.* at 817.

The Pennsylvania Supreme Court reversed the Superior Court, ruling that Lynn's conviction under the 1995 statute was not erroneous. The Court observed that despite the usual rule of lenity, child endangerment statutes "are written expansively

9

by the legislature 'to cover a broad range of conduct in order to safeguard the welfare and security of our children,'" and should be construed to effectuate that broad purpose. *Id.* at 818 (quoting *Commonwealth v. Marlin*, 305 A.2d 14, 18 (Pa. 1973)); *see also id.* at 822. The 1995 statute covers "[a] parent, guardian or other person supervising the welfare of a child," 18 Pa. C.S. § 4304(a), and the Supreme Court held that "the statute is plain and unambiguous that it is not the child that [Lynn] must have been supervising, but the child's welfare." *Id.* at 823. The Court reasoned that "the requirement of supervision is not limited to only certain forms of supervision, such as direct or actual," but "[b]y its plain terms . . . encompasses all forms of supervision of a child's welfare." *Id.* at 824. "[S]upervision," the Court explained, "is routinely accomplished through subordinates, and is no less supervisory if it does not involve personal encounters with the children. Like [Lynn], school principals and managers of day care centers supervise the welfare of the children under their care through their management of others." *Id.* Lynn came within the purview of the statute because, "by his own concession, he supervised the welfare of the children of the Archdiocese." *Id.*

The Court said that the views of the grand jury and the DA (who declined to prosecute Lynn under the 1995 statute) did not "prove the meaning of the . . . statute, which is determined by analyzing [its] plain language." *Id.* at 827. The Court also discounted the subsequent amendment of § 4304, invoking Pennsylvania's statutory interpretation statute, which provides that legislative history is not taken into account when a statute's language is clear. *Id.* (citing 1 Pa. C.S. § 1921). The Court added that "while the former version of a statute is relevant to discern the legislative intent of a later version when the statutory language is ambiguous, the inverse is not true." *Id.* In other words, while the 1995 version of the statute might

10

illuminate the meaning of the 2007 statute, the 2007 statute could not illuminate the meaning of the 1995 statute. Concluding that Lynn's conduct fit within the plain language of the 1995 statute, the Pennsylvania Supreme Court reversed the Superior Court and held there was sufficient evidence to convict. *Id.*

## C. Procedural History

The Commonwealth filed a criminal complaint against Spanier in 2012—five years after the statutory amendments described above, but before the Pennsylvania Supreme Court held in *Lynn* that the pre-amendment child endangerment statute did not require "personal encounters with . . . children." 114 A.3d at 824. Spanier moved to quash the complaint, arguing that the charges should be dismissed because the allegedly wrongful acts were committed in 2001 and the normal two-year statute of limitations expired in 2003. The Commonwealth responded that Spanier engaged in a course of conduct endangering child welfare until 2012, and therefore he "was charged well within the applicable statute of limitation." App. 498. The trial court rejected Spanier's limitation argument, and in 2017, two years after *Lynn*, the case went to trial.[1]

The count that became Count 1 charged that Spanier, "being a parent, guardian, or a person supervising the welfare of various children under 18 years of age, knowingly

---

[1] We omit the procedural history of the case between 2012 and 2017, which involved (among other things) an interlocutory appeal regarding whether the testimony of Penn State's former general counsel was admissible. *See Commonwealth v. Spanier*, 132 A.3d 481, 482 (Pa. Super. Ct. 2016). What transpired during that time is not relevant to the issues we address in this appeal.

11

endangered the welfare of said children." App. 417. This language tracked the 1995 statute because it omitted the phrase added in 2007, "or a person that employs or supervises such a person." The statutory reference, however, was 18 Pa. C.S. § 4304(a)(1). App. 417. In the 1995 statute, there was no paragraph (a)(1); the 2007 amendment had changed the structure of the statute to create paragraph (a)(1). Thus, the language of the criminal information reflected the 1995 statute, but its statutory reference reflected the 2007 statute.[2]

At the start of trial, the judge instructed the jury using the language of the 1995 statute. App. 704 ("elements of the first count" include that "the defendant was, at the time he endangered the welfare of a child, a parent, guardian, or person supervising the welfare of the child"). At the charge conference near the end of trial, Spanier's attorney objected that the final instruction the judge planned to give "has the language of the current [2007] statute, and, as we've said throughout this case, we think the [1995] language should apply." App. 1215. The court ultimately rejected this argument, and at the end of trial, it instructed the jury using the language of the amended, 2007 statute:

> The defendant has been charged with endangering the welfare of a child. To find the defendant guilty of this offense, you must find that each of the following elements has been proven beyond a reasonable doubt. . . .
> [T]hat the defendant was at the time a parent, guardian, person supervising the welfare of a

_____

[2] Spanier was acquitted of Count 2 (preventing or interfering with a report of child abuse) and Count 3 (conspiracy to endanger the welfare of a child), so those counts form no part of his habeas petition or this appeal.

12

> child under the age of 18, <u>or a person that</u>
> <u>employs or supervises such a person. The term</u>
> <u>"person supervising the welfare of a child"</u>
> <u>means a person other than a parent or guardian</u>
> <u>that provides care, education, training, or control</u>
> <u>of a child.</u>

App. 1306-07 (emphasis added, indicating language added in 2007 statutory amendment). The jury found Spanier guilty of this count. But, when asked on the verdict slip whether there was a "Course of Conduct (Yes or No)," the jury answered "no." App. 1397. Because there was no course of conduct, Spanier was convicted of a misdemeanor. *See* 18 Pa. C.S. § 4304(b) ("An offense under this section constitutes a misdemeanor of the first degree. However, where there is a course of conduct . . . , the offense constitutes a felony of the third degree."). Spanier was sentenced to two months of incarceration, two months of house arrest, and two years of probation.

In its post-trial opinion, the trial court concluded there was no error in instructing the jury using the 2007 statutory language. It rested this conclusion on *Lynn*, reasoning that, even under the 1995 statute, supervising the welfare of a child was not limited to direct supervision. App. 1533, 1539. The court also concluded that the prosecution was not barred by the statute of limitations because, under the amended, 2007 version of 42 Pa. C.S. § 5552(c), the statute would not run until the child McQueary saw in the shower turned 50 years old. McQueary testified that the child was 10 to 12 years old, so the statute would run in "approximately the year 2039." App. 1526. Notably, as explained above, the Commonwealth had not relied on pre- or post-amendment § 5552(c) before or during trial; it had argued that there was no problem with the normal § 5552(a) two-year statute of limitations because Spanier's

13

course of conduct lasted until 2012. The jury's finding that there was no course of conduct took that argument off the table and brought § 5552(c) into play.

On appeal, the Superior Court relied on *Lynn* to affirm Spanier's conviction. *Commonwealth v. Spanier*, 192 A.3d 141, 150-54 (Pa. Super. Ct. 2018). The Court also rejected Spanier's statute of limitations argument, concluding that there was no due process violation in the Commonwealth's reliance on the § 5552(c) statute of limitations. *Id.* at 145-48. Spanier's petition for allowance of appeal in the Pennsylvania Supreme Court was denied.

Spanier had the right to continue pursuing relief in state court under Pennsylvania's Post-Conviction Review Act, but he chose instead to file a petition for a writ of habeas corpus in federal court under 28 U.S.C. § 2254. The District Court granted the petition, holding that Spanier's conviction violated the Ex Post Facto and Due Process Clauses. *Spanier v. Libby*, No. 3:19-CV-523, 2019 WL 1930155, at *15, 18 (M.D. Pa. Apr. 30, 2019). However, it concluded that the application of the § 5552(c) statute of limitations did not violate due process. *Id.* at *19. The Commonwealth appeals.

## II.[3]

### A. The Ex Post Facto Clause

The state courts rejected Spanier's argument that his conviction violated the Ex Post Facto Clause. They relied on *Lynn*, 114 A.3d at 796, to rule that Spanier's conduct was criminalized by the 1995 version of the statute, which was in effect when he committed the conduct. The District Court

---

[3] The District Court had jurisdiction under 28 U.S.C. § 2254(a). This Court has jurisdiction under 28 U.S.C. §§ 1291, 2253(a).

analyzed the Ex Post Facto Clause together with the Due Process Clause and held that the state courts' application of *Lynn* violated both. *Spanier*, 2019 WL 1930155, at *7-15. We begin by addressing the District Court's ex post facto holding.

The Ex Post Facto Clause provides that "[n]o State shall . . . *pass* any . . . ex post facto Law." U.S. Const. art. I, § 10, cl. 1 (emphasis added). Passage of a law is strictly a legislative function, so "[t]he Ex Post Facto Clause, by its own terms, does not apply to courts." *Rogers v. Tennessee*, 532 U.S. 451, 460 (2001). Rather, "[a]s the text of the Clause makes clear, it 'is a limitation upon the powers of the Legislature . . . .'" *Id.* at 456 (quoting *Marks v. United States*, 430 U.S. 188, 191 (1977)). Here, the Pennsylvania General Assembly did not provide that the 2007 version of the statute would apply retroactively. *See* 18 Pa. C.S. § 4304 (2007); Act of Nov. 29, 2006, No. 2006-179, 2006 Pa. Laws 1581, 1589 (providing that amendments to § 4304 "shall take effect in 60 days"). Therefore, there was no ex post facto violation.

The real problem, according to Spanier and the District Court, is how the state courts construed the child endangerment statute through their application of the Pennsylvania Supreme Court's *Lynn* decision. Where a state court unforeseeably applies a law retroactively, that is a due process problem. *Bouie v. City of Columbia*, 378 U.S. 347, 353-54 (1964) ("If a state legislature is barred by the Ex Post Facto Clause from passing [an unforeseeable retroactive enlargement of a law] . . . , it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction."). Any constitutional violation that occurred here would be a due process error, not an ex post facto error. We proceed, then, to the due process analysis.

## B. Due Process and the Jury Instruction

The Due Process Clause requires that a criminal statute "give fair warning of the conduct that it makes a crime." *Id.* at 350. A statute cannot give fair warning, of course, where it is "vague or overbroad." *Id.* at 351. The required fair warning also might be lacking where a statute, which is "precise on its face," is "unforeseeably and retroactively expanded by judicial construction." *Id.* at 352. But not every after-announced change in criminal law is a due process violation. Instead, due process is violated where a state court's interpretation of a criminal statute is "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." *Id.* at 354. This formulation preserves the necessary balance. It gives state courts "leeway" as they perform their work of judicial interpretation, but also "adequately respects the due process concern with fundamental fairness and protects against vindictive or arbitrary judicial lawmaking by safeguarding defendants against unjustified and unpredictable breaks with prior law." *Rogers*, 532 U.S. at 461-62.

This appeal requires us to decide whether the Pennsylvania Superior Court's affirmance of Spanier's conviction, based on its construction of the 1995 statute, was "unexpected and indefensible." *Bouie*, 378 U.S. at 354. For the reasons we will explain, we conclude it was not, and therefore habeas relief is not warranted. First, though, we must consider whether Spanier's claim was properly before the District Court.

### 1. Exhaustion

The Commonwealth argues that Spanier should not have received habeas relief because he did not follow the statutory directive to "exhaust[] the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). A claim is exhausted when the petitioner raises it on direct appeal, "fairly

16

present[ing] . . . [its] factual and legal substance . . . in a manner that puts [state courts] on notice that a federal claim is being asserted." *Bennett v. Superintendent*, 886 F.3d 268, 280 (3d Cir. 2018) (internal quotation marks omitted) (quoting *McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999)). The petitioner must "cit[e] the relevant provision of the United States Constitution and federal cases supporting his argument." *Id.* at 281. Because due process takes a variety of forms, we evaluate exhaustion with reference to the particular kind of due process claim at issue. *See Gray v. Netherland*, 518 U.S. 152, 164-65 (1996) (separately analyzing exhaustion of due process claims that rested on distinct bodies of case law "aris[ing] in widely differing contexts").

The Commonwealth argues that Spanier failed to exhaust his claim because, on direct appeal of his conviction, he cited *United States v. Marcus*, 560 U.S. 258, 263-64 (2010), and *Marks*, 430 U.S. at 191-92. The Commonwealth contends that he needed to cite *Rogers*, 532 U.S. at 461. However, *Marcus*, *Marks*, and *Rogers* deal with the same kind of due process violation—retroactive application of a change in criminal law through judicial decision-making—at different stages of a case. *Marcus* and *Marks* deal with trial error. *Marcus*, 560 U.S. at 264 (holding that due process is violated "if the jury . . . was not instructed about [a criminal statute's] enactment date" and convicts a defendant for "noncriminal, preenactment conduct"); *Marks*, 430 U.S. at 196 (holding that due process is violated if the trial court instructs the jury based on the current interpretation of a statute, rather than the interpretation that controlled at the time of the allegedly criminal acts). *Rogers* deals with the same kind of error on appeal. 532 U.S. at 454-56 (considering whether state appeals court violated due process by retroactively abolishing a common-law defense the defendant had relied on).

The Commonwealth, citing *Gray*, 518 U.S. at 164, argues that Spanier did not exhaust the particular kind of due process claim he now asserts. The different types of due process claims involved in *Gray*, however, were supported by separate lines of cases. 518 U.S. at 164. Here, by contrast, a single line of cases stemming from *Bouie* supports the due process arguments Spanier made both on direct appeal and in the District Court on habeas. Unlike the defendant in *Gray*, Spanier presented the "factual and legal substance" of his claim to the state courts and "cit[ed] the relevant provision of the United States Constitution and federal cases supporting his argument." *Bennett*, 886 F.3d at 280-81 (citation omitted). Therefore, his claim is exhausted.

2. Merits

Spanier argued on direct appeal that the jury instruction regarding child endangerment was erroneous because it was based on the 2007 version of the statute rather than the 1995 version. The trial court charged the jury that it should convict Spanier if it found that, in addition to knowingly violating a duty of care, protection, or support to a child, Spanier was "at the time a parent, guardian, person supervising the welfare of a child under the age of 18, <u>or a person that employs or supervises such a person</u>." App. 1307 (emphasis added, indicating language added in 2007 statutory amendment). The Pennsylvania Superior Court held that, "[o]n the facts of this case" and "[g]iven . . . the *Lynn* Court's treatment of the pre-2007 version of § 4304," there was no reversible error. *Spanier*, 192 A.3d at 154. On habeas review, the District Court concluded that the Superior Court's application of *Lynn* to affirm Spanier's conviction violated due process. *Spanier*, 2019 WL 1930155, at *15-17.

At the threshold, the Commonwealth argues that this issue is not cognizable in habeas corpus litigation because we

18

are "bound to accept" a state supreme court's construction of its own state's statutes. *Missouri v. Hunter*, 459 U.S. 359, 368 (1983). This argument fails. While we are indeed bound by the Pennsylvania Supreme Court's construction of Pennsylvania statutes, we are not bound by Pennsylvania courts' conclusions regarding violations of the United States Constitution. *See id.* Whether the 2007 statute was impermissibly applied to Spanier has clear federal due process dimensions, and we do not defer to the Pennsylvania courts' holdings on this point.

To determine whether the District Court erred in holding there was a due process violation, we must decide whether the state court decision—here, the Pennsylvania Superior Court's affirmance of Spanier's conviction, based on its interpretation of *Lynn*—"was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The Supreme Court has emphasized that "[t]his standard . . . is 'difficult to meet': . . . [the petitioner] must show that the challenged state-court ruling rested on 'an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Metrish v. Lancaster*, 569 U.S. 351, 357-58 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011)). "'[C]learly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Therefore, we consider Supreme Court decisions up to 2018, when the Pennsylvania Superior Court affirmed Spanier's conviction.

In the 1964 *Bouie* case, individuals conducting a sit-in at a segregated lunch counter were convicted of criminal trespass under a state statute that forbade uninvited entry "after notice . . . prohibiting such entry." 378 U.S. at 348-49 (quoting

19

S.C. Code Ann. § 16-386 (1960 Cum. Supp.). Soon after, the South Carolina Supreme Court issued an opinion in a different case, *Mitchell*, holding that the statute also prohibited remaining on property after being told to leave. *Id.* at 350 n.2 (citing *City of Charleston v. Mitchell*, 123 S.E.2d 512 (S.C. 1961)). Then, when the *Bouie* defendants appealed their convictions, the South Carolina Supreme Court affirmed on the basis of *Mitchell*. *Id.* at 350. The U.S. Supreme Court reversed, stating that *Mitchell*'s broader interpretation was "clearly at variance with the statutory language" and, furthermore, in the 95 years leading up to *Mitchell*, state cases "uniformly emphasized the notice-before-entry requirement, and gave not the slightest indication that that requirement could be satisfied by proof of the different act of remaining on the land after being told to leave." *Id.* at 356-57. *Mitchell* was an "unexpected and indefensible" interpretation of the statute in light of prior law, and therefore its application to affirm the conviction was a due process violation. *Id.* at 354 (citation omitted).

This case is like *Bouie* in that the state appellate court applied state supreme court precedent post-dating the conduct in question (here, *Lynn*) to affirm the conviction. *See id.* at 350. However, the South Carolina statute at issue in *Bouie* was unlike the 1995 Pennsylvania child endangerment statute in at least one important way. The South Carolina trespassing statute was "precise on its face": it applied to "entry upon the lands of another . . . after notice . . . prohibiting such entry." *Id.* at 351-52 (quoting S.C. Code § 16-386). The 1995 Pennsylvania child endangerment statute is not similarly precise: its language, "parent, guardian or other person supervising the welfare of a child," 18 Pa. C.S. § 4304(a), leaves room for—and even necessitates—judicial interpretation. This language raises, among other questions, the

20

issues of what is meant by "supervising" and who is a "person supervising the welfare of a child." Therefore, the Pennsylvania courts' work to interpret the child endangerment statute is hardly unforeseeable, as was the South Carolina Supreme Court's sudden expansion of that state's unambiguous trespassing statute.

We next consider the 2001 opinion in *Rogers v. Tennessee*. There, the defendant stabbed a man who died of the injury fifteen months later, and the defendant was then convicted of murder. 532 U.S. at 454. The defendant appealed on the basis of the common law rule under which there could be no murder conviction unless the victim died within a year and a day. *Id.* at 453-54. On appeal, the Tennessee Supreme Court abolished the rule and affirmed the conviction. *Id.* at 455. The U.S. Supreme Court reiterated that due process is violated only by "judicial interpretations of criminal statutes . . . that are 'unexpected and indefensible,'" because state courts need "substantial leeway . . . as they engage in the daily task of formulating and passing upon" common law doctrines. *Id.* at 461-62 (quoting *Bouie*, 378 U.S. at 354). The state court's ruling "was not unexpected and indefensible" because the year and a day rule was "widely viewed as an outdated relic of the common law," *id.* at 462, had never served as the basis of a decision, and was mentioned in state case law only three times in dicta, *id.* at 464. Therefore, there was no due process violation. *Id.* at 467.

The principles enunciated in *Rogers* are certainly relevant here: state courts need leeway to engage in their work, and federal courts should not hold routinely that this work violates due process. *Id.* at 461-62. But the Tennessee court struck down an outmoded common law rule that was never really established in Tennessee law. *See id.* at 462-64. That decision bears little resemblance to the Pennsylvania Superior

21

Court's interpretation of the child endangerment statute based on its reading of *Lynn*. Therefore, the outcome in *Rogers* is not especially illuminating here.

The final relevant Supreme Court case is *Metrish v. Lancaster*, issued in 2013. There, the defendant was convicted of first-degree murder. 569 U.S. at 354. He invoked Michigan's "diminished capacity" defense, which applied to individuals who were not insane, but whose mental illness "negat[ed] the *mens rea* element of first-degree murder." *Id.* At the time of the killing, the defense was well established. Although the Michigan Supreme Court had not recognized it, the intermediate appellate court had done so repeatedly, and the pattern jury instructions included the defense. *Id.* at 355-57.

After the killing, but before the defendant's trial, the Michigan Supreme Court addressed the defense for the first time in *People v. Carpenter*, 627 N.W.2d 276 (Mich. 2001). The Michigan Supreme Court eliminated the defense. It explained that the Michigan legislature had enacted a "'comprehensive statutory scheme' . . . to govern defenses based on mental illness." *Metrish*, 569 U.S. at 364 (quoting *Carpenter*, 627 N.W.2d at 282). The diminished capacity defense, which had existed before the statute was enacted but was not mentioned in the statute, was—the Michigan Supreme Court concluded—"incompatible" with the statutory scheme. *Id.* at 363, 365. Later, when the defendant appealed, the state's intermediate appellate court held that applying *Carpenter* retroactively did not violate due process because "*Carpenter* concerned an unambiguous statute that was interpreted by the [Michigan] Supreme Court for the first time." *Id.* at 365 (internal quotation marks and citation omitted). The U.S. Supreme Court agreed there was no due process violation. *Id.*

22

The Court noted that it reached the same outcome—no due process violation—in both *Metrish* and *Rogers*, even though the defense eliminated in *Rogers* was "outdated" and "widely rejected," while the defense eliminated in *Metrish* was widely recognized. *Id.* at 365-67 (citation omitted). Acknowledging that different outcomes might have been expected based on the different statuses of the two defenses, the Court explained that merely because the Michigan defense was widely recognized was "hardly sufficient to warrant federal habeas relief under 28 U.S.C. § 2254(d)(1)'s demanding standard." *Id.* at 367. The habeas standard is so rigorous that relief is not available merely because the state supreme court announces a new rule of law. Rather, the new rule must be "unexpected and indefensible by reference to [existing] law." *Id.* at 368 (quoting *Rogers*, 532 U.S. at 462). The Michigan Supreme Court's *Carpenter* decision did not meet this definition. The U.S. Supreme Court noted that it had "never found a due process violation in circumstances remotely resembling [those]—*i.e.*, where [1] a state supreme court, squarely addressing a particular issue for the first time, [2] rejected a consistent line of lower court decisions [3] based on the supreme court's reasonable interpretation of the language of a controlling statute." *Metrish*, 569 U.S. at 367-68.

Here, as in *Metrish*, [1] the Pennsylvania Supreme Court, in *Lynn*, squarely addressed for the first time the application of the 1995 statute to those who supervised the welfare of children without supervising the children themselves. According to the District Court and Spanier, *Lynn* [2] rejected a consistent line of Pennsylvania Superior Court decisions that applied the 1995 version of the child endangerment statute only to defendants who were directly involved with children. *Spanier*, 2019 WL 1930155, at *14. And *Lynn* is [3] the state supreme court's reasonable

23

interpretation of the language of the statute.[4] As in *Metrish*, the state appellate court held that retroactively applying the state supreme court decision, *Lynn*, did not violate due process. *See Spanier*, 192 A.3d at 153-54. Based on these parallels, *Metrish* weighs against a finding that there was a due process violation here.

We must now decide, in light of *Bouie*, *Rogers*, and *Metrish*, whether the Pennsylvania Superior Court's affirmance of Spanier's conviction "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The District Court, on habeas review, concluded that the Superior Court's decision met this standard. *Spanier*, 2019 WL 1930155, at *15. The Court also held that the jury instruction permitted a conviction either because Spanier supervised the welfare of a child by "provid[ing] care, education, training, or control," or because he was "a person that employs or supervises such a person." *Id.* at *17 (quoting jury instructions). According to the District Court, the second option was available only under the amended 2007 statute, and permitting a conviction on that alternative basis violated due process by relieving the Commonwealth of its burden to prove every element of the 1995 statute. *Id.*

---

[4] The District Court did not conclude that *Lynn* was unexpected and indefensible; it concluded that the Superior Court's affirmance of Spanier's conviction was. *Spanier*, 2019 WL 1930155, at *15. Similarly, Spanier does not attack *Lynn*. Instead, he argues that "the state courts in his case misinterpreted *Lynn*" and incorrectly interpreted "the 1995 statute as including language added in 2007." Appellee's Br. 40 n.10.

24

The Commonwealth argues that the District Court erred and that the application of *Lynn* to affirm Spanier's conviction was not unexpected and indefensible. Spanier's response aligns with the District Court. He says *Lynn* held that the 1995 statute required the defendant to have supervised the welfare of a child either directly or indirectly, and that the 2007 statute added another category of persons who could be liable: those who are "*not supervising the welfare of a child*," even indirectly, but are "employing or supervising someone else who was doing so." Appellee's Br. 43. He argues that his due process rights were violated because the jury could have convicted him based on a finding that he fit in the new category.

However, due process was violated here only if the Superior Court's affirmance of Spanier's conviction was an "unexpected and indefensible" interpretation of the child endangerment statute in light of prior law, i.e., *Lynn. See Bouie*, 378 U.S. at 354 (citation omitted). We conclude that it was not. The Superior Court extensively reviewed the *Lynn* decision before holding that it was not error to instruct the jury using the language of the 2007 statute. *Spanier*, 192 A.3d at 150-54. The Court began by noting *Lynn*'s commentary that the child endangerment statute "is protective in nature, and must be construed to effectuate its broad purpose of sheltering children from harm." *Id.* at 150 (quoting *Lynn*, 114 A.3d at 818). Such statutes "are written expansively by the legislature to cover a broad range of conduct in order to safeguard the welfare and security of our children." *Id.* (quoting *Lynn*, 114 A.3d at 818). Therefore, "[t]he common sense of the community, as well as the sense of decency, propriety and the morality which most people entertain is sufficient to apply the statute to each particular case, and to individuate what

25

particular conduct is rendered criminal by it." *Id.* at 151 (quoting *Lynn*, 114 A.3d at 818).

The Superior Court rejected Spanier's argument that he was positioned differently than Lynn, a diocesan official who was "responsible for protecting children from sexual abuse." *Id.* at 152. The Court held that Spanier "oversaw and approved the university's woefully deficient response" to the abuse allegations, so the fact that his official duties did not include addressing child abuse did "not undermine or preclude a conclusion that he was supervising the welfare of a child." *Id.* at 153. To support this conclusion, the Superior Court quoted *Lynn*'s holding that the 1995 statute, "[b]y its plain terms, . . . encompasses all forms of supervision of a child's welfare." *Id.* at 152 (quoting *Lynn*, 114 A.3d at 824).

The Superior Court also was unpersuaded by Spanier's argument that his case is distinguishable from *Lynn* because he "did not supervise persons who interacted directly with the minor in question, as did the *Lynn* defendant or as would a school principal or daycare manager." *Id.* The Superior Court pointed out that "[t]he *Lynn* Court held that it is the child's welfare that is supervised" under the child endangerment statute. *Id.* Because Spanier "supervised his school's response to repeated allegations of on-campus abuse of a minor by a high-status former employee with access to campus facilities[,] [h]e was clearly supervising a child's welfare pursuant to *Lynn*." *Id.*

Finally, the Superior Court addressed Spanier's argument that the jury instruction was erroneous and stated that, "[g]iven our analysis of . . . the *Lynn* Court's treatment of the pre-2007 version of [the statute], we discern no reversible error." *Id.* at 154. The Superior Court held that "the language added [to the statute] in 2007 or, more appropriately, the language not included in the pre-2007 version, does not alter

26

the result here." *Id.* It concluded that "[o]n the facts of this case, the trial court's instruction on the 2007 version of the . . . statute did not result in an inaccurate statement of the law." *Id.* Although the Superior Court did not say it in so many words, the import of its holding is that the "employs or supervises" language included in the jury instruction accurately reflected the meaning of the 1995 statute. *See id.* This analysis flows directly from its careful reading of *Lynn*. We cannot agree with Spanier that the Superior Court "misinterpreted *Lynn*" and incorrectly construed "the 1995 statute as including language added in 2007." Appellee's Br. 40 n.10.

We acknowledge that, in some respects, this case is like *Bouie*—where there was a due process violation in the application of a state supreme court decision that changed the meaning of a state statute. *Bouie*, 378 U.S. at 361. But in other respects, this case is like *Metrish*—where there was no due process violation in the application of a state supreme court decision that struck down a widely relied-upon defense to criminal liability. *Metrish*, 569 U.S. at 365. Because of the equipoise in the case law, the habeas standard is particularly important here: the writ may not be granted unless the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1). There can be no "possibility for fairminded disagreement." *Metrish*, 569 U.S. at 357-58 (quoting *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011)). "[T]he petitioner must demonstrate that Supreme Court precedent *requires* [a] contrary outcome" to the state court decision. *Rosen v. Superintendent*, 972 F.3d 245, 252 (3d Cir. 2020) (quoting *Matteo v. Superintendent*, 171 F.3d 877, 888 (3d Cir. 1999) (en banc)). Here, *Bouie* and *Metrish* point in different directions, creating more than a possibility for fairminded disagreement. Therefore, we must reverse in light of "28

27

U.S.C. § 2254(d)(1)'s demanding standard." *Metrish*, 569 U.S. at 367.

The District Court cited *Bouie* and *Rogers*, but did not examine them closely. *Spanier*, 2019 WL 1930155, at *12. Nor did it mention *Metrish*. The Court pointed to the 2005 grand jury report discussed in *Lynn*, which declined to recommend charging Lynn under the 1995 version of the child endangerment statute and instead recommended that the statute be amended. *Id.* at *15. The *Lynn* opinion, however, clarifies that "[t]he decisions of neither the grand jury nor a prior District Attorney [who chose not to charge Lynn under the 1995 statute] prove the meaning of the . . . statute, which is determined by" plain-language analysis. *Lynn*, 114 A.3d at 826-27. Following this holding, we conclude that the subsequent grand jury report is not persuasive evidence of the meaning of the 1995 statute, and therefore does not demonstrate that the application of *Lynn* was "unexpected and indefensible." *See Bouie*, 378 U.S. at 354.

Even if we agreed with Spanier that the jury instruction improperly reflected the 2007 statute, we would still reverse. "[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004). We consider the instruction "in the context of the instructions as a whole and the trial record," asking "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)).

There is not a reasonable likelihood that the jury convicted Spanier on the basis of the contested jury instruction language—that is, by finding that he was "a person that employs or supervises" someone who is supervising the

28

welfare of a child. App. 1307. The jury instruction at the beginning of the trial reflected the 1995 statute and did not include the "employs or supervises" language. App. 704. In his opening statement, Spanier followed suit, emphasizing that to convict, the jury would need to "find that [Spanier] knowingly endangered the welfare of a child by violating a duty of care, protection or support, to a child whose welfare he was supervising." App. 739. And the Commonwealth's theory of the case was that Spanier himself supervised the welfare of a child, not that he employed or supervised such a person. Although the prosecutor argued in closing that "[t]he buck stopped with" Spanier and that he was "the top of the food chain," her repeated theme was that if Spanier, Schultz, and Curley had "call[ed] the authorities and let the authorities investigate it, . . . [t]hey wouldn't have been responsible. But they took it upon themselves." App. 1282. She continued with the theme that Spanier assumed responsibility for supervising the welfare of a child:

> [Spanier, Schultz, and Curley] don't have a duty to support this child, but their duty of care and protection came when they took it. When they decided in their little group that they weren't going to call the outside agency, that they weren't going to tell their own University police, but that they themselves, the three of them, were going to be the cabal that was going to keep him under control. They took that responsibility. They can't hide from it now. They took it upon themselves . . . .

> And, again, that's a person supervising the welfare of a child under the age of 18. They chose that. They didn't have to. It's a choice that Graham Spanier made.

29

App. 1290. Therefore, it is not reasonably likely that the jury convicted Spanier because he employed someone who supervised the welfare of a child—rather than because he himself supervised the welfare of a child.

On direct appeal, the Pennsylvania Superior Court took care to note how the record showed that Spanier himself was supervising the welfare of a child. It stated multiple times that because Spanier "personally oversaw [the university's] response" to the abuse allegations, he "was clearly supervising a child's welfare pursuant to *Lynn*." *Spanier*, 192 A.3d at 153-54. The Court reached its conclusion that there was no error in the jury instruction in light of "the facts of this case." *Id.* at 154. We agree with, and defer to, the Superior Court's reasonable reading of the record. *See Waddington v. Sarausad*, 555 U.S. 179, 193-94 (2009) (holding that even if the jury instruction was ambiguous, the state courts reasonably concluded, after reviewing the trial record, that the jury's conviction was not based on the incorrect understanding of the law that the defendant said the instruction had conveyed).

In sum, we conclude that there was no due process error with regard to the jury instruction. Under clearly established federal law, state courts have considerable latitude to rule on the meaning of statutes, and this latitude extends to announcing a new rule of law to uphold a conviction—so long as the new rule is not unexpected and indefensible. In addition, there is not a reasonable likelihood that the jury convicted based on the contested language in the jury instruction. Given the demanding standard on habeas corpus review of state-court convictions, we conclude that the District Court erred in granting the petition.

### C. Due Process and the Statute of Limitations

The District Court held that Spanier's due process rights were not violated by the application of the statute of limitations

30

provided in 42 Pa. C.S. § 5552(c). *Spanier*, 2019 WL 1930155, at \*19. Spanier argues that this was error, and that we may affirm the grant of his habeas petition on the alternative basis that the application of the statute indeed violated due process. *See Murray v. Bledsoe*, 650 F.3d 246, 247 (3d Cir. 2011) ("We . . . may affirm the District Court's judgment on any basis supported by the record."). We disagree that the application of the statute of limitations provides a basis to affirm.

Spanier's limitation argument turns on the multi-part structure of the statute, 42 Pa. C.S. § 5552, and on its 2007 amendment. At the time of Spanier's crimes, in 2001, Pennsylvania's "[g]eneral" criminal statute of limitations was two years, but there was an "[e]xception[]" for "[a]ny sexual offense committed against a minor": such a prosecution might be commenced "any time up to the period of limitation provided by law after the minor has reached 18 years of age," that is, until the victim's twentieth birthday. 42 Pa. C.S. § 5552(a), (c)(3) (2000). In 2007, when the child endangerment statute and its limitations rule were amended, the legislature added another exception: prosecution may be commenced "up to the later of the period of limitation provided by law after the minor has reached 18 years of age <u>or the date the minor reaches 50 years of age</u>." *Id.* § 5552(c)(3) (2007) (emphasis added).

When the Commonwealth began prosecuting Spanier in 2012, its theory was that the general two-year statute of limitations controlled. The Commonwealth argued that Spanier endangered the welfare of children through a course of conduct that extended from 2001 (when he and Schultz and Curley decided not to report Sandusky to the authorities) until 2012 (when Sandusky was convicted). But the jury rejected that theory. Although it found Spanier guilty of endangering the welfare of a child, it indicated on the verdict slip that

31

Spanier had not engaged in a course of conduct. That meant Spanier was convicted solely for his actions in 2001—eleven years before the prosecution began. Therefore, the § 5552(a) two-year statute of limitations could not control. Nevertheless, the trial court held there was no limitations problem, pointing to the § 5552(c) exception, which the Commonwealth had not invoked at any point before the verdict.

This lengthy setup brings us to Spanier's argument: he contends that his due process rights were violated because he did not have notice, prior to the verdict, that the § 5552(c) exception might apply. He argues that if he had known the Commonwealth would rely on § 5552(c)(3), he would have investigated and put on evidence regarding the age of the boy McQueary saw in the shower. McQueary testified that the boy was "[r]oughly 10 to 12 years old" at the time, App. 806, but if the boy was actually fourteen, he would have turned 20—and the statute of limitations would have run—in 2006, before the January 2007 amendment. In that scenario, the prosecution would be time-barred. *See Commonwealth v. Harvey*, 542 A.2d 1027, 1030 (Pa. Super. Ct. 1988) (en banc) (if "the prior statute of limitations has run before the new statute of limitations becomes effective[,] . . . the cause of action has expired, and the new statute of limitations cannot serve to revive it").

The Pennsylvania Superior Court concluded that Spanier's due process rights were not violated as a matter of state law. Under "[e]stablished Pennsylvania law," a defendant may be convicted of an uncharged offense that is "a lesser-included offense of the charged crime." *Spanier*, 192 A.3d at 146 (quoting *Commonwealth v. Houck*, 102 A.3d 443, 449-50 (Pa. Super. Ct. 2014)). Therefore, the Superior Court held, the charge of felony endangerment (i.e., a course of conduct of endangerment) put Spanier "on notice that he was liable to be convicted of misdemeanor [endangerment]" (i.e.,

32

endangerment without a course of conduct). *Id.* In addition, the Court held, the complaint was filed "well outside of the general two-year limitations period of § 5552(a)," so "it was plainly evident . . . that § 5552(c)(3) would govern the limitations period for a misdemeanor [endangerment] prosecution." *Id.* at 146-47.

The Superior Court also observed that § 5552(c)(3) is not a tolling provision (those are codified in § 5554, titled "Tolling of statute"). *Id.* at 149; *see also* 42 Pa. C.S. § 5552(c) (2000) (providing "Exceptions" to the general rule and not mentioning tolling). Therefore, Pennsylvania's rule requiring notice of intent to rely on a tolling provision did not apply. *Spanier*, 192 A.3d at 149. "The purpose of this rule is to apprise a defendant that he must defend not only against the crime itself, but also against the limitation of prosecution." *Id.* at 148. The rule is crucial where the prosecution will have to prove separate "fact(s) . . . to toll the statute of limitations." *Id.* In Spanier's case, however, "the prosecution for misdemeanor [endangerment] was not dependent upon proof of any facts outside those already alleged in the complaint." *Id.* at 148-49. Therefore, "notice requirements under due process were not violated here." *Id.* at 149.

Under the deferential habeas standard, we may not grant relief unless the Superior Court's opinion "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Spanier says the decision violated his clearly established due process right to notice of the charges to permit the preparation of his defense. The Superior Court's cogent opinion explains that Spanier received notice commensurate with due process. *Spanier*, 192 A.3d at 146-49. Spanier ignores that opinion. He continues to refer to § 5552(c)(3) as a "toll[ing]" provision, Appellant's Br. 58,

although it is not, 192 A.3d at 148-49. Nor does he explain, given Pennsylvania law regarding lesser-included offenses, why the complaint failed to put him on notice that § 5552(c) might apply. Therefore, Spanier does not show that the Superior Court's reasoning contradicts clearly established federal law. The District Court correctly ruled that the statute of limitations issue is not a basis for habeas relief.

## III.

For these reasons, we will reverse the grant of Spanier's habeas corpus petition.